06-3647-cr
USA v. Abdulle (Mohamed)

05-cr-677
E.D.N.Y.
Amon, J.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

(On Submission: April 18, 2008                    Decided: April 22, 2009)

Docket No. 06-3647-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

LIBAN M. ABDULLE, HASSAN SADIQ MOHAMED, MUHIDIN A. MOHAMED,

*Defendants,*

ISMAIL ALI MOHAMED

*Defendant-Appellant.*

_____

Before NEWMAN, SOTOMAYOR and
KATZMANN, *Circuit Judges*.

_____

Defendant-appellant Ismail Ali Mohamed appeals from a July 31, 2006 judgment of the United States District Court for the Eastern District of New York (Amon, J.) convicting him, following a jury trial, of conspiracy to distribute and possess with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  Defendant-appellant argues that the trial evidence was insufficient to prove that he knew that cathinone was a controlled substance or that he conspired to distribute and possess with the intent to distribute that specific substance.  We disagree and affirm the judgment of conviction.

1

John J. Durham, Assistant United States Attorney (Emily Berger, Assistant United States Attorney, *on the brief*), *for* Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for appellee.*

David H. Weiss, New York, New York, *for defendant-appellant*.

SOTOMAYOR, *Circuit Judge*:

Defendant-appellant Ismail Ali Mohamed ("Mohamed") appeals from a July 31, 2006 judgment of the United States District Court for the Eastern District of New York (Amon, J.) convicting him, following a jury trial, of conspiracy to distribute and possess with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

On appeal, Mohamed argues that the trial evidence was insufficient to sustain the charges against him because the government failed to prove that he knew that cathinone was a controlled substance or that he conspired to deal in that particular substance. Because we conclude that the government's evidence was sufficient to show both that Mohamed knew that cathinone was a controlled substance and that he conspired to possess and distribute that specific substance, we affirm the judgment of conviction.

## BACKGROUND

### I. MOHAMED'S TRIAL

We recount the evidence presented at trial "'in the light most favorable to the government, drawing all inferences in the government's favor.'"[1] *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (citing *United v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999)).

---

[1] Mohamed presented evidence only through cross-examination.

## A.    The August 18, 2005 Arrests and Preceding Events

In January 2005, the Nassau County Police Department ("NCPD") began a series of investigations into the importation and distribution of khat, a leafy plant native to East Africa and the Arabian Pennisula that can contain substances regulated by United States law.  The NCPD learned that khat was frequently transported into the United States through overnight delivery services such as the FedEx Corporation ("Federal Express"), the United Parcel Service, and DHL International ("DHL").  In April 2005, the NCPD received information about a specific khat shipment that DHL was scheduled to deliver to Hassan Sadiq Mohamed ("Sadiq"), one of Mohamed's alleged co-conspirators.  On April 22, NCPD officers visited DHL's sorting facility and confirmed the existence of a thirty to thirty-five pound package of khat addressed to a street location on the border of Rosedale and Valley Stream, New York.  The officers arranged for a controlled delivery[2] of the package, and when the DHL truck arrived at the destination, Sadiq was already waiting in a silver Toyota 4-Runner ("4-Runner") with Massachusetts license plates.  Sadiq stepped out of the 4-Runner, picked up the package directly from the delivery truck, and drove away.  The 4-Runner was registered and owned by Liban Abdulle ("Abdulle"), another alleged co-conspirator.

Later that year, on August 16, 2005, NCPD officers discovered that Sadiq had listed 49 Nixon Court, Brooklyn, New York ("Nixon Court") as his home address on an unrelated police report.  At 5:30 A.M. on August 18, 2005, an NCPD surveillance team traveled to that location.  Although neither Sadiq nor the 4-Runner was seen, the team noticed a white Ford Explorer ("Explorer") with a Minnesota license plate adjacent to the Nixon Court address.  Because the

---

[2] Detective Thomas Kelly testified at trial that a "controlled delivery" is one in which the package is under surveillance from the moment it leaves law enforcement custody until it is accepted by the addressee.

NCPD's investigation had discovered that a suspected khat distribution ring frequented a number of hotels near John F. Kennedy International Airport ("JFK") to receive international couriers and to facilitate the domestic distribution of khat, NCPD Detectives Thomas Kelly, Patrick Ryder, and Joseph Lore moved their surveillance activities to the JFK Inn, located next to the airport. Once there, the surveillance team noticed the 4-Runner that Sadiq had driven on April 22, which was now being operated by Abdulle. A few minutes later, they saw the Explorer with Minnesota license plates that they had seen earlier that morning outside of Nixon Court arrive at the JFK Inn as well. Detective Ryder testified that he could see that the Explorer was being driven by Sadiq, and that the man later identified as Mohamed was sitting in the back seat. Detective Ryder also testified that he was able to observe that the rear cargo area of the Explorer was empty. Shortly thereafter, the Explorer left the JFK Inn. After a few minutes, the Explorer returned, and both vehicles drove away from the hotel.

The detectives lost sight of the 4-Runner in traffic, but were able to follow the Explorer to Five Star Printing, a store on Queens Boulevard that offered photocopying, rental mailboxes, and other business services. Sadiq left the Explorer, entered Five Star Printing briefly, and then returned to the street. In the interim, Detective Ryder left his own vehicle to conduct surveillance of the scene on foot. Detective Ryder stated that, at one point, when Mohamed lowered his window to talk to Sadiq, Ryder was able to walk past the Explorer and observe a person chewing khat in the front seat, a bundle of khat and banana leaves next to Mohamed in the back seat, and several brown boxes in the rear cargo area similar to ones that frequently contain khat. Ryder relayed this information to the other law enforcement officers and told them to prepare to make arrests.

The 4-Runner, still driven by Abdulle, then arrived to join the Explorer on the street, and the officers moved in and arrested Mohamed and the others. Detective Kelly confirmed what Detective Ryder had seen earlier, testifying that when he took the men into custody he observed that "[t]o the left of Mr. Mohamed was a white plastic-type garbage bag. Protruding out of the garbage bag was a bundle of khat," and there "were boxes containing khat" in the cargo area. Mohamed, the others, and the two vehicles were subsequently taken to law enforcement offices in Manhattan. Once interviewed, Mohamed admitted that he had rented the Explorer with cash and had driven it to New York to visit an acquaintance. He also claimed that he had intended to drive the khat back to Minnesota for personal use.

Detective Lore testified that he drove the Explorer following the arrests and that the vehicle had a "pungent" smell, which he attributed to the khat. When the Explorer's contents were catalogued, the boxes were found to contain approximately forty-five kilograms of khat wrapped in banana leaves. Shirley George ("George"), a Drug Enforcement Agency ("DEA") forensic chemist, testified that she performed chemical analyses on khat samples seized from the Explorer. The samples contained both cathinone, a substance listed on Schedule I of the Controlled Substances Act ("CSA"), and cathine, listed on Schedule IV. She was unable to identify the purity or concentration of either substance in the samples. George also explained to the jury that cathine's listing on Schedule IV implied that in some circumstances it might have a valid medical use. In contrast, she explained that Schedule I substances, like cathinone, have no currently accepted medical use and are always illegal.

**B.     Sadiq's Rental Box at Five Star Printing**

Dulinda Munasinghe ("Munasinghe"), Five Star Printing's store manager at the time of

the relevant events, testified that the store rented personal mailboxes and sent and received overnight delivery packages for its mailbox rental customers. A customer, whom Munasinghe knew by the name "Hassan," rented a box at Five Star and received packages a few times each month. At trial, Munasinghe identified "Hassan" as Sadiq, the man he had seen arrested outside the store.

Munasinghe testified that in August 2005, the man he knew as "Hassan" attempted to pickup a DHL shipment addressed to his mailbox three times, once on the day before the arrests (August 17) and twice on the day of the arrests (August 18). In each instance, Munasinghe informed "Hassan" that he had refused to accept the shipment because "Hassan" was behind on his rental payments.

Unbeknownst to Munasinghe, the shipment in question, which had been mailed via overnight delivery from Luxembourg, had already been seized by New York Police Department Detective Angelo Conetta, who had then posed as the DHL driver attempting to deliver the package. Munasinghe told the disguised Conetta that he would not accept the shipment because the name on the DHL airbill did not match any existing account at the store. Once turned away, Conetta handed the shipment over to DEA agents. The package was later found to contain approximately twenty-eight kilograms of khat containing both cathinone and cathine.

C.     **Mohamed's Prior Khat Receipt in Minnesota**

Prior to the August 2005 incident, on March 28, 2002, Mohamed was arrested and charged with accepting five boxes of khat with cathinone at his Minneapolis home.[3] The boxes, which had been shipped through Federal Express and seized by law enforcement at the

---

[3] The trial testimony does not reveal the ultimate disposition of this arrest.

Minneapolis airport, each tested positive for cathinone and had a total weight of approximately 150 pounds. Minneapolis Police Detective Randall Olson testified that he had participated in the controlled delivery and that Mohamed had signed, accepted, and stated that he was expecting the boxes. An audio recording of Olson's interaction with Mohamed was played for the jury.

### D. Khat Importation, Distribution, and Pricing

United States Immigration and Customs Enforcement Special Agent Jacquelyn Lynch ("Lynch") provided expert testimony regarding khat's importation, distribution, and pricing. Lynch stated that khat can contain two active ingredients: cathinone, a Schedule I substance that is illegal at all times, and cathine, a Schedule IV drug that may be illegal if not imported with the proper authorizations. Lynch further testified that cathinone is present in khat for forty-eight hours after harvesting, at which point the chemical weakens and eventually dissipates entirely. Lynch also stated that this process can be delayed if the khat is kept cold and moist by wrapping it in banana leaves or Saran Wrap, freezing it, or sprinkling it with water.

Lynch explained that traffickers usually import khat into the United States from Africa and the Middle East through shipment points in London, Luxembourg, and Amsterdam, as those cities have direct flights into the United States and the "idea is to get it here as quickly as possible." Specifically, most khat enters the country through JFK and Newark International Airports. Once there, it is either sold in the surrounding region or shipped to other parts of the country, such as "Ohio, in Cleveland and Cincinnati . . . often, Minneapolis, Minnesota." Delivery to such cities usually involves the use of large rental trucks or vans because they are cost-effective, minimize outside scrutiny, and can be used to pick up shipments directly at the airport.

Lynch testified that the cost of a kilogram of khat ranged from $300 to $400, and the price for a "bundle" of khat ranged from $28 to $50. In August 2005, a bundle of khat sold in New York would have cost approximately $35, while a similar bundle sold in the Minnesota area would have cost five to ten dollars more due to transportation and labor costs.

Lynch also testified that because of the rate at which cathinone dissipates once khat leaves have been harvested, possession of one kilogram of khat, which would yield approximately nine bundles, was consistent only with distribution, not personal use.

## III. PROCEDURAL HISTORY

Mohamed was charged, *inter alia*, with conspiracy to distribute and possess with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession with intent to distribute a Schedule I controlled substance, cathinone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). The case was tried from April 4, 2006 to April 5, 2006. At the close of the evidence, Mohamed moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied from the bench. Mohamed did not object to the jury charge, and after the verdict he was sentenced principally to two months' imprisonment.

Mohamed's appeal was submitted to this panel on April 18, 2008. Mohamed argued that the government failed to present evidence sufficient to show that he possessed the intent required to sustain the convictions. On September 19, 2008, this Court decided *United States v. Hassan*, an unrelated case that vacated a khat-related conviction. 542 F.3d 968, 992 (2d Cir. 2008). We thereafter asked the parties to submit supplemental briefs on the relevance of *Hassan* to the issues on appeal.

8

**DISCUSSION**

**I.    SUFFICIENCY OF THE EVIDENCE**

**A.    Standard of Review**

We review *de novo* challenges to the sufficiency of the evidence, and "affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004).  To succeed on such a challenge, Mohamed "bears a heavy burden."  *United States v. Henry*, 325 F.3d 93, 103 (2d Cir. 2003).

**B.    Analysis**

Khat, the common name for the plant *catha edulis*, is not itself a controlled substance under the CSA.  *Hassan*, 542 F.3d at 972.  Its leaves, however, may contain up to two stimulants that are controlled: 1) cathinone, a Schedule I controlled substance, 21 C.F.R. § 1308.11(f)(3); and 2) cathine, a Schedule IV controlled substance, 21 C.F.R. § 1308.14(e)(1).  As a result, khat's regulation is dependent upon the chemical composition of the leaves at issue, which can vary depending on the particular leaf.  *See* Schedules of Controlled Substances: Placement of Cathinone and 2,5-Dimethoxy-4-ethylamphetamine Into Schedule I, 58 Fed. Reg. 4316, 4317 (Jan. 14, 1993) ("When khat contains cathinone, khat is a Schedule I substance . . . . When khat does not contain cathinone, but does contain cathine, khat is a Schedule IV substance.").  That is, once a leaf is cut from a khat plant, any cathinone in the leaf becomes "unstable" and "rapidly decomposes" into the less potent substance cathine.  United States Food and Drug Administration, Basis for the Recommendation for Control of Cathinone into Schedule I of the Controlled Substances Act 9 (Nov. 5, 1992).  Thus, a newly harvested leaf may contain cathinone, while the same leaf a few days later may contain only cathine, the weaker, Schedule

9

IV stimulant.[4]  *Id.*

Although 21 U.S.C. § 841(a) makes it unlawful for a defendant "knowingly or intentionally" to manufacture, distribute, or dispense (or possess with intent to manufacture, distribute, or dispense) a controlled substance, "the law is settled that a defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1); it is sufficient that he [or she] be aware that he [or she] possesses some controlled substance." *United States v. Morales*, 577 F.2d 769, 776 (2d Cir. 1978); *see United States v. Hussein*, 351 F.3d 9, 18 (1st Cir. 2003) ("[T]he cases are legion that a defendant can lawfully be found guilty of having violated section 841(a)(1) even if he [or she] did not know the exact nature of the drug that he [or she] possessed as long as he [or she] knew that he [or she] possessed an illegal drug."). Because khat is not listed on the controlled substance schedules, *see* 21 C.F.R. §§ 1308.11–.15, the mens rea requirement of § 841(a) cannot be satisfied merely by proving that the defendant knowingly possessed khat. Instead, where the government seeks to satisfy the mens rea requirement of § 841(a) for a khat-related offense, the government must prove that the defendant knew that he or she possessed some regulated substance. *See Hassan*, 542 F.3d at 983 & n.6 (holding, with respect to conspiracy charges, that the government "bear[s] the burden of proving, at a minimum, that there is evidence sufficient to prove beyond a reasonable doubt that [the defendant] knew that he [or she] was dealing with a substance regulated by federal drug abuse laws" (internal quotation marks omitted)).

---

[4] For a more detailed background on khat and the khat regulatory regime, see *Hassan*, 542 F.3d at 972–73.

Accordingly, when an indictment charges a defendant with knowing possession with intent to distribute cathinone (as the indictment did in this case),[5] the government need not prove that the defendant knew that he or she possessed cathinone. The mens rea requirement would be satisfied if, for example, the government proved that the defendant knew that he or she possessed a controlled substance, but thought that substance was cathine or another regulated substance. Similarly, where an indictment charges a defendant with conspiracy to distribute and possess with intent to distribute cathinone, as here,[6] the mens rea requirement for conspiracy is satisfied simply if the government shows that the defendant intended to distribute and possess with the intent to distribute *any* controlled substance.[7] *See United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) ("Here, the government had to establish to the jury's satisfaction beyond a reasonable doubt that [the defendant] knew that [he or] she was engaged in a conspiracy to import into the United States some controlled substance."); *United States v. Carrera,* 259 F.3d 818, 830 (7th Cir. 2001) ("A defendant may be convicted of a violation of 21 U.S.C. § 846 without knowing the exact type of drug involved. The government need only prove that the defendant was aware that some controlled substance was involved." (citations omitted)).

In order to prosecute successfully a charge under 21 U.S.C. § 841, however, the

---

[5] Indictment Count Three charged that Mohamed "did knowingly and intentionally possess with intent to distribute a controlled substance, which offense involved a substance containing cathinone, a Schedule I controlled substance."

[6] Indictment Count One charged that Mohamed "did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cathinone, a Schedule I controlled substance."

[7] We emphasize that Mohamed was charged under 21 U.S.C. § 841(b)(1)(C). We do not address the proof of knowledge or intent required to convict a defendant of a conspiracy charged under 21 U.S.C. § 841(b)(1)(A)–(B).

11

government must still demonstrate (in addition to the appropriate mens rea) the actus reus—i.e., that the defendant actually manufactured, distributed, dispensed, or possessed a controlled substance. We have previously held that a variation between the controlled substance described in the indictment and the controlled substance proven at trial may be permissible when it "affect[s] neither the Government's case nor the sentence imposed" and does not "prejudice[] the ability of the defendants to make their defense to the charge that they violated 21 U.S.C. § 841." *United States v. Knuckles*, 581 F.2d 305, 311 (2d Cir. 1978). Whereas, in *Knuckles*, the Court concluded that such a variation did not affect the sentence imposed, that is not the case with cathinone, a Schedule I drug, and cathine, a Schedule IV drug. *Compare* 21 U.S.C. § 841(b)(1)(C) (setting "a term of imprisonment of not more than 20 years" for a Schedule I controlled substance or life in prison if "death or serious bodily injury results from the use of such substance") *with id.* § 841(b)(2) (setting "a term of imprisonment of not more than 3 years" for a Schedule IV controlled substance). Consequently, although it is clear that "an indictment drawn in general terms may support a conviction on alternative bases," *United States v. Wozniak*, 126 F.3d 105, 110 (2d Cir. 1997)*,* the government cannot specifically charge possession of cathinone but then only demonstrate possession of cathine at trial. Likewise, with a charge of conspiracy, where the "criminal agreement itself is the *actus reus*," *United States v. Shabani*, 513 U.S. 10, 16 (1994), the government cannot satisfy the actus reus element by alleging in the indictment a conspiracy to distribute cathinone but then seek a conviction at trial based on an agreement to distribute cathine.

In this case, the government's indictment charged Mohamed with possession of and conspiracy to possess and distribute cathinone, the "Schedule I controlled substance." As outlined above, the government needed to prove a similar mens rea element for both the possession and the conspiracy charges: that Mohamed knew that he possessed and intended to deal in some type of

12

controlled substance. The actus reus element for the possession charge required the government to then prove that Mohamed in fact possessed cathinone, and the actus reus element for the conspiracy charge required the government to show that Mohamed agreed to participate in a scheme dealing with cathinone—the charged object of the conspiracy—or that substance by another hypothetical name. Neither party challenges these requirements.

On appeal, Mohamed broadly contends that, assuming *arguendo* that he knew that the khat at issue contained cathinone, a rational jury could not have found that he knew that cathinone is a controlled substance. Mohamed asserts that the government therefore failed to establish the appropriate mens rea for either charge—that he knew he possessed a controlled substance, or that he knowingly dealt in a controlled substance.

This argument is contradicted by the record. In 2002, Mohamed was arrested and charged with the receipt of a 150-pound shipment of cathinone. This is direct evidence of his knowledge that cathinone is a regulated substance under United States law.[8] In denying Mohamed's Rule 29 motion, the district court rightly classified this incident as "a prior similar act from which the jury could infer . . . knowledge and intent" of cathinone's illegal nature.

Also, the jury was presented with evidence from the 2005 charged events that Mohamed attempted to conceal his efforts, supporting the inference that Mohamed knew that the khat he actually possessed, and the khat he had intended to import, distribute, and possess, contained an illegal substance. The air-bill that accompanied the khat shipment to Five Star Printing was

---

[8] Mohamed appears to make an independent argument that the district court erred in its limiting instruction on the 2002 Minnesota controlled delivery by stating that he had "accepted a shipment of cathinone." But Minneapolis Police Detective Olson testified that the 2002 package tested positive for cathinone, and this testimony was unrebutted. The district court was therefore not in error to tell the jury: "You have heard testimony that the defendant accepted a shipment of cathinone in 2002."

misleadingly addressed to "3LKON INC." and erroneously described the contents of the package as "MAGAZINES (SAMPLES)." A rational jury could have inferred that Mohamed and the others used the misleading air-bill to try to obscure the contents of the package because they knew that it contained a controlled substance, and they therefore feared detection by the authorities.

As to the actus reus element required for the conspiracy charge, Mohamed asserts that the evidence was insufficient to find that he agreed to distribute and possess specifically cathinone.[9] Though he concedes that "there was certainly sufficient evidence from which a jury could have concluded that [he agreed] to transport a large amount of khat leaves back to Minnesota, perhaps even for distribution," he claims that the government failed to prove that this agreement extended beyond a scheme to possess and distribute cathinone-free khat leaves. Based on the evidence presented at trial, we disagree.

First, there was ample proof that Mohamed and the others had agreed to preserve the cathinone in the khat by minimizing the elapsed time between the plant's harvest and its consumption. This evidence included the use of an overnight delivery service to speed the importation of the leaves into the United States from Luxembourg and Mohamed's rental of a Ford Explorer so that he could immediately return to Minnesota. Because Special Agent Lynch testified that cathinone traffickers often rent vans to transport the substance domestically, and use overnight shipping from places like Luxembourg to import it internationally, a rational jury might have inferred that Mohamed and the others were relying on these practices for the very same

---

[9] Mohamed challenges the actus reus element required for the possession charge by pointing out that the government's laboratory reports did not specify, and the government's chemist could not determine, the precise concentration of cathinone in the seized khat samples. But it is cathinone's presence in khat, not its concentration or volume, that is relevant in proving the act element of a cathinone possession charge. *See, e.g.,* 21 C.F.R. § 1308.11(f)(3) (applying to "any quantity" of cathinone). The government's burden as to this element was thus satisfied.

14

purposes, as was consistent with their agreement. Sadiq's repeated attempts to pick up the package of khat at Five Star Printing would further suggest that speed of transport was critically important to the group's agreement.

Second, Mohamed and the others wrapped the khat in banana leaves, a step that Special Agent Lynch testified is used by cathinone traffickers to preserve cathinone. In rebuttal, Mohamed suggests that without an additional packing measure, such as dry ice, much of the cathinone would still have dissipated by the time Mohamed reached Minnesota. But the fact that Mohamed's efforts were incomplete or not as effective as they might have been does little to mitigate the persuasiveness of this piece of evidence. In fact, had Mohamed only agreed to possess and distribute khat without cathinone, the banana leaves would have hindered this purpose by slowing the chemical's dissipation.

Third, the khat intercepted en route to Five Star Printing, as well as the khat seized from the Explorer, tested positive for cathinone. This direct evidence heavily buttresses the government's interpretation of the above events, because attempts to expedite the transport of khat point most clearly to an agreement to preserve the presence of cathinone where those efforts are, indeed, successful.[10]

---

[10] The presence of cathinone also neutralizes a flaw we identified in the evidence in *Hassan*, i.e., that the government failed to prove when the khat in question was harvested, which made it impossible for the jury to infer that the khat shipment was specifically arranged to maximize the probability that the leaves would still contain cathinone after arriving in the United States. *See Hassan*, 542 F.3d at 984 ("There is nothing in the record with respect to how much time it actually took to ship the khat to the United States, i.e., how much time had elapsed between the moment the khat was picked in Northeast Africa and the time it arrived in the United States. Thus, the fact that Hassan used overnight delivery services and hired people to help him get khat out of Customs quickly does not without more support an inference that he was doing so in order to import khat *containing a controlled substance*."). Here, however, because the seized khat actually contained cathinone, it is self-evident that the khat's harvesting, packaging, and importation was structured to ensure that the chemical remained in the leaves once the shipment

Collectively, the evidence presented at trial was sufficient to support the jury's finding of guilt on each count. *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) ("[W]e consider the evidence in its totality, not in isolation . . . ."). As relevant to the mens rea requirement for both charges, a rational jury could have found that Mohamed knew he possessed and intended to deal in a controlled substance by inferring that he and the others expedited the importation of the Five Star Printing package and concealed its contents in order to minimize the possibility that their illicit activities would be detected. That he was arrested on cathinone-related charges in 2002 directly suggests that he knew that the cathinone he intended to possess and in fact possessed was controlled under United States law. As to the actus reus requirement for possession, the government presented uncontroverted evidence that the khat in Mohamed's control actually contained cathinone. As to the same requirement for conspiracy, a rational jury could have concluded that the group's use of an international overnight delivery service, banana leaves, and a large rental vehicle at the airport were all part of an agreement to preserve cathinone in the khat. Indeed, each step was consistent with expert testimony regarding known cathinone-trafficking practices.

Finally, with respect to the jury instructions, while Mohamed concedes that the district court "correctly referred to the prohibited substance as cathinone throughout its charge to the jury," he also asserts that "the government's persistent mischaracterization of khat as an illegal drug throughout the trial completely undermined the reliability of the jury's verdict."[11]

reached the United States from Luxembourg.

[11] Mohamed also argues that conflicting testimony regarding the rate at which cathinone degrades similarly affected the jury's verdict. Specifically, Special Agent Lynch stated: 1) "[A]fter approximately forty-eight hours, [the cathinone] starts to weaken."; 2) "[T]he potency is

As we explained in *Hassan*, khat's legality and its dual regulatory scheme require the government to use precise language throughout trial to minimize juror confusion regarding the substance actually being charged. *See Hassan*, 542 F.3d at 992. Mohamed does point to a number of instances where the government's language could have been construed to suggest that khat itself is a controlled substance. But in *Hassan*, we had "serious concerns" regarding both the defendant's knowledge of cathinone as a controlled substance and the defendant's agreement to deal in that particular chemical. 542 F.3d at 984–85. Here we have none. Mohamed's 2002 arrest showed that he knew that cathinone is regulated, and the group's extensive—and successful—efforts to preserve that chemical leave no doubt as to his agreement to deal in cathinone. The direct proof of cathinone in the seized bundles further minimizes the possibility that the jury mistakenly convicted Mohamed based on possession of or conspiracy to distribute or possess cathine or khat alone.[12] *Cf. Hassan*, 542 F.3d at 982 ("What differentiates this case . . . is that there was *no direct evidence* that any of the khat . . . imported *actually contained a controlled substance*.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

only good for the first forty-eight hours."; 3) "[The cathinone] starts to expire after that forty-eight hours." We fail to identify any inconsistencies in this testimony. To the extent that the testimony contained erroneous information, such inaccuracies were cured by the fact that in every instance the seized khat did, in fact, contain cathinone.

[12] We also note that *Hassan*'s concern for a particularized jury charge regarding the khat-related regulatory scheme was explicitly limited to the "circumstances of th[at] case." *Id*. at 992.