USA v. Medunjanin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2013

(Argued: February 20, 2014                    Decided: May 20, 2014)

Docket No. 12-4724

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

ADIS MEDUNJANIN, aka Muhammad,

Defendant-Appellant.[*]

_____

Before: KEARSE, WESLEY, and DRONEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York convicting defendant of terrorism-related crimes involving a conspiratorial plan, at the behest of al-Qaeda, to carry out coordinated suicide bombings in the New York City subway system. Defendant challenges the denial of his motion to suppress postarrest inculpatory statements. See 2012 WL 1514766 (E.D.N.Y. May 1, 2012).

---

[*] The Clerk of Court is instructed to amend the official caption to conform with the above.

Affirmed.

DAVID BITKOWER, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Peter A. Norling, James P. Loonam, Berit W. Berger, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

ROBERT C. GOTTLIEB, New York, New York (Justin Heinrich, Gottlieb & Gordon, New York, New York; Stephanie M. Carvlin, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Adis Medunjanin appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial on a superseding indictment before John Gleeson, Judge, convicting him on all nine of the counts against him, to wit: conspiring to use weapons of mass destruction against persons or property in the United States, in violation of 18 U.S.C. § 2332a(a)(2) (Count 1); conspiring to commit murder in a foreign country, in violation of id. § 956(a)(1) (Count 2); providing material support to a foreign terrorist organization, and conspiring to do so, in violation of id. § 2339B(a)(1) (Counts 3 and 4); receiving military-type training from a foreign terrorist organization, in violation of id. § 2339D(a) (Count 5); conspiring and attempting to commit an act of terrorism transcending national boundaries, in violation of id. §§ 2332b(a)(1)(A), (a)(2), and 18 U.S.C. § 2 (Counts 7 and 8); and possessing a destructive device in furtherance of crimes of violence, in violation of id. §§ 924(c)(1)(A)(i), (c)(1)(A)(iii), (c)(1)(B)(ii), and (c)(1)(C) (Counts 9 and 11). Medunjanin was sentenced principally to life plus 95 years' imprisonment. On appeal, he contends principally that the district court, Raymond J. Dearie, Judge, erred in denying his pretrial motion to suppress certain of his postarrest statements on the grounds that questioning by the

government violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), his Sixth Amendment right to counsel, and his Fifth Amendment right to substantive due process. Finding no merit in his contentions, we affirm the judgment.

# I. BACKGROUND

The present prosecution grew out of an investigation by a Joint Terrorism Task Force ("JTTF") comprising agents of the Federal Bureau of Investigation ("FBI") and detectives from the New York City Police Department ("NYPD") (collectively the "agents"). Medunjanin came to the attention of the task force after he traveled from his home in New York City with Najibullah Zazi and Zarein Ahmedzay to Pakistan in August 2008, intending to fight with the Taliban against American forces in Afghanistan, and instead was persuaded to receive training from al-Qaeda and return to the United States to participate in coordinated suicide bombings in the New York City subway system. These events culminated in Medunjanin's arrest in January 2010 after he, fearing he was about to face charges that included conspiracy to commit murder, drove to the Whitestone Expressway in Queens, New York, and deliberately caused a high-speed collision with another car, attempting to trigger an explosion that would kill himself and others.

After his arrest, Medunjanin made certain incriminating statements to law enforcement officers. He moved to suppress those statements on the grounds that the questioning by the agents, who knew he had an attorney, violated his rights under the Fifth and Sixth Amendments to the Constitution. Following a hearing at which the district court heard testimony from a dozen witnesses, including eight law enforcement officers and two members of Medunjanin's family (but not

Medunjanin himself), the court denied the motion. The following description of the events is taken largely from the decision of the district court, which found the testimony of the government witnesses credible, convincing, and for the most part uncontroverted. Few of the court's factual findings are disputed.

A. The Events in September 2009

On September 14, 2009, JTTF agents, in pursuit of materials and plans for making improvised explosive devices, executed a search warrant for the Queens, New York apartment where Medunjanin lived with his parents and his sister. While the search was going on, Medunjanin agreed to speak with FBI Special Agent Farbod Azad and NYPD Detective Angel Maysonet. To avoid the distraction of the search, the agents interviewed Medunjanin on the street a short distance from his home. They told him the interview was entirely voluntary and that he was not under arrest. Medunjanin could easily have left; he instead stayed and talked, calmly, with Azad and Maysonet for about two-and-a-half hours.

Medunjanin spoke about Islam, American-Israeli and American-Islamic relations, and the 9/11 attacks on New York City. He said he had traveled to Pakistan with Zazi and Ahmedzay seeking a wife but had found the requested "dowry" too high. Medunjanin vouched for Zazi's character; he said he and Zazi were close friends and conversed about once a month. When the agents said they could check telephone records, Medunjanin admitted that he and Zazi spoke about 15 times a month.

On September 17, 2009, Medunjanin agreed to accompany the same agents to the United States Attorney's Office in Brooklyn to be interviewed again. He went voluntarily and was not

restrained at any time. This interview lasted approximately 10 hours, with breaks for Medunjanin to eat, use the bathroom, and pray. He was again cooperative and spoke freely about religion, Islam, his background, and how he had become more religious; but he was evasive about his trip to Pakistan with Zazi and Ahmedzay. Medunjanin denied that he had engaged in any kind of weapons training there and again said he had gone to Pakistan on a failed mission to get married. He signed a consent-to-search form for a DNA swab, fingerprints, a voice exemplar, and shoe prints; when the interview ended, he agreed to speak with the agents again.

On September 19, 2009, Zazi was arrested. Medunjanin thereafter met with attorney Robert Gottlieb, and on September 28, 2009, retained Gottlieb to act as his attorney in connection with the JTTF investigation. Gottlieb notified Agent Azad and Assistant United States Attorney ("AUSA") Jeffrey Knox that Gottlieb was representing Medunjanin and asked that Medunjanin not be interviewed unless Gottlieb was present. The agents made no further attempts to question Medunjanin in 2009. Medunjanin remained, however, under surveillance.

B. The Arrest and Questioning of Medunjanin in January 2010

On January 7, 2010, between 1:30 and 2:00 p.m., Azad and Maysonet executed a new search warrant at Medunjanin's home, this one for his United States and Bosnian passports. Medunjanin asked whether his attorney had been contacted; Azad said he had not but that Medunjanin could contact the attorney if he wished. Medunjanin did not do so while the agents were there. After the passports were produced, Maysonet asked Medunjanin whether he had signed his name as "Muhammad," which law enforcement agents had learned was Medunjanin's al-Qaeda alias or kunya. Medunjanin did not answer and was visibly shaken by the question.

As soon as the agents left, Medunjanin did an internet search with respect to the criminal code sections cited in the search warrant; upon seeing that one section referred to homicide, he tried to reach Gottlieb. When Gottlieb returned Medunjanin's call, he said, inter alia, that he would call Azad.

Gottlieb spoke to Azad, who confirmed that Medunjanin's passports had been seized pursuant to the search warrant. Azad referred Gottlieb to AUSA Knox for further information about the investigation. Gottlieb was unable to reach Knox by telephone but left a message for him. Knox did not return Gottlieb's telephone call until the next day.

In the meantime, Medunjanin remained upset by Maysonet's use of his al-Qaeda kunya and by the seriousness of the charges listed in the search warrant. Between 3:30 and 4:00 p.m., Medunjanin left home and drove from his building onto the Whitestone Expressway, driving at some 90 m.p.h. He wove in and out of traffic, crossing several lanes, planning to cause an explosive collision. In order to make clear that this would not be viewed as an ordinary rush hour accident, Medunjanin called 911, identified himself, and proclaimed "we love death more than you love life" (Hearing Transcript ("Tr.") at 102; see id. at 287) and, as translated from Arabic, "there is no God but Allah and Muhammad is His messenger," repeating the latter several times. Medunjanin then turned and sped directly into another car.

Immediately after the crash, Medunjanin attempted to run from the scene but was stopped and handcuffed by one of the agents who had followed him from his home. Medunjanin was shaken and complained of elbow, shoulder, and neck pain, but was not seriously injured. When first asked how he was, his reaction was to ask whether the inquiring agent was Jewish and then to lecture the agent calmly about problems with Judaism as a religion. Medunjanin was taken to a Queens

hospital, where he was examined by a triage nurse and physicians. CT scans of his head and neck were negative, and no medication was administered or prescribed.

While Medunjanin was at the hospital, he was questioned by several agents. Azad arrived first with NYPD Detectives Michael Carney and Robert Murphy, members of the JTTF, and they confirmed with hospital staff that Medunjanin was alert and had not been medicated. They removed Medunjanin's handcuffs; Azad introduced the detectives; and they all shook hands with Medunjanin. Azad acknowledged that Medunjanin had an attorney but said that, even so, the agents would like to speak with Medunjanin if he was willing. They talked with him for about 15 minutes before administering Miranda warnings. Medunjanin was told that it was up to him to decide whether or not to talk to the agents, that he could avoid such topics as he wished, and that he could stop at any time. Murphy told Medunjanin that Murphy was a father, that he would want to know the truth if one of his children was being investigated by the FBI, and that, whatever the truth, he would love his child. Medunjanin told the agents he wanted to fire his attorney because the attorney was expensive and was not accomplishing anything for him. (Medunjanin's family had already paid Gottlieb more than $8,000 in fees.) Azad and Murphy said they could not give Medunjanin advice with respect to his attorney, though they agreed the attorney was expensive.

Medunjanin read and signed a Miranda waiver form, following which he was questioned by the agents for about two-and-a-half hours. Medunjanin admitted that he had traveled to Pakistan with Zazi and Ahmedzay, intending to fight with the Taliban in Afghanistan against the United States. Medunjanin told the agents that when Maysonet had used his kunya, Muhammad, Medunjanin realized he would be arrested and imprisoned for the rest of his life, and he thus sought to perform a final act of jihad when he called 911, made his proclamation, and caused the crash,

hoping to spark an explosion that would kill other people.

When Medunjanin was discharged from the hospital, leaving at about 8:30 p.m, the agents took him to JTTF offices in Manhattan. After Medunjanin and the agents had dinner, the questioning continued. Medunjanin described his trip to Pakistan with Zazi, the failed attempt to enter Afghanistan to fight alongside the Taliban, and their subsequent religious and weapons training at an al-Qaeda camp. Medunjanin was calm and almost boastful as he described the types of weapons he had been trained to fire. He became defensive and evasive when the agents asked about any impending attacks in the United States and whether he knew of, or was involved in, terrorist activity; but he was otherwise cooperative and forthcoming, appearing to be generally relieved and eager to talk.

At about 2:00 a.m. on January 8, Medunjanin was presented with a waiver-of-speedy-arraignment form that indicated he was being charged with receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D; the form also contained a section for waiver of Miranda rights. Medunjanin was told that if he agreed to continue the interview, he would remain in the JTTF office overnight; if he wanted to end the interview, he would be processed, spend the night at the detention center, and be arraigned later in the day. Medunjanin agreed to continue talking with the agents and signed the form waiving his right to a speedy arraignment and, again, his Miranda rights. He also signed a consent-to-search form for his cellular telephone. He was allowed to perform ablutions and pray. The agents departed, leaving Medunjanin with guards. Another agent provided Medunjanin with bedding, but Medunjanin told the agent he was not ready to sleep and wanted to keep talking. Those two then talked for nearly an hour about, inter alia, religion and military service, comparing the agent's service with Medunjanin's experiences in Pakistan. The agent ended the

discussion so that Medunjanin could sleep.

In the meantime, throughout the evening of January 7, Gottlieb and Medunjanin's family attempted unsuccessfully to determine his whereabouts. They tried the hospital and learned that Medunjanin had been discharged into the custody of officers from the 109th precinct. At the precinct, Gottlieb identified himself to the desk officer as Medunjanin's lawyer and said he did not want Medunjanin questioned. Gottlieb was told that Medunjanin was not there and was in the custody of the JTTF. Despite calls to various law enforcement offices, Gottlieb and his staff were unable to learn where Medunjanin was.

Gottlieb telephoned AUSA Knox again on the morning of January 8, 2010. Several hours later, Knox returned the call and told him that Medunjanin would be arraigned that afternoon; Knox also said that Medunjanin no longer wanted Gottlieb to represent him. Knox refused to disclose Medunjanin's whereabouts.

On the morning of January 8, Medunjanin was taken to the FBI office for processing. He read and signed a third Miranda waiver form around 12:20 p.m., and was questioned thereafter by Azad and Carney for about two hours and by another FBI agent for another hour. That afternoon, the grand jury returned an indictment charging Medunjanin in two counts: receiving military-type training from al-Qaeda, in violation of 18 U.S.C. § 2339D(a), and conspiring to commit murder in a foreign country, in violation of 18 U.S.C. § 956(a)(1). Azad learned of the indictment shortly after it was returned, met with AUSAs in Brooklyn and was given a new waiver-of-speedy-arraignment form to present to Medunjanin, and returned to the Manhattan FBI office where Medunjanin was being questioned. Medunjanin was presented with the new form, which listed the two charges and included the following statement: "I have been advised that attorney Robert Gottlieb has requested to speak

with me"; the form provided spaces for Medunjanin to indicate by check mark whether or not he wanted to speak to Gottlieb. Medunjanin read the form, said he disagreed with the murder conspiracy charge because he did not believe they were going to commit murder, and checked the line that said he wanted to speak to Gottlieb. The agents then ceased their questioning.

Knox, who had earlier called Gottlieb to ask him to come to the arraignment in order to have the matter of Medunjanin's representation clarified, called Gottlieb again to tell him that Medunjanin would not be arraigned until the next morning. Gottlieb met with Medunjanin on January 9 before his arraignment.

C. The Denial of Medunjanin's Motion To Suppress

The superseding indictment included the nine counts against Medunjanin described above. Prior to trial, Medunjanin moved to suppress the incriminating statements he made to JTTF agents on January 7 and 8, 2010, on the grounds, inter alia, that the postarrest questioning by agents violated his rights under the Fifth and Sixth Amendments. He argued that by calling Gottlieb just after Azad and Maysonet had seized his passports and departed on January 7, 2010, he intended to, and did, invoke his Fifth Amendment right to counsel; that Gottlieb had informed the government that he did not want Medunjanin questioned; and that the agents' postarrest questioning of Medunjanin thus violated his Fifth Amendment rights as set out in Miranda and Edwards v. Arizona, 451 U.S. 477 (1981). He also argued that he did not thereafter knowingly or voluntarily waive his Miranda rights because he was influenced by the agents' statements that Gottlieb's services were too expensive and by what he viewed as threats by the agents to arrest members of his family if he did not sign the waiver forms. And he argued that the government tried to prevent him from having contact with Gottlieb--by

telling him that Gottlieb was too expensive, by refusing to reveal his whereabouts to Gottlieb, and by questioning him without informing him that Gottlieb wanted to speak with him--and thereby unreasonably interfered with his Sixth Amendment right to counsel and his Fifth Amendment right to substantive due process.

In a thorough Memorandum of Decision dated March 28, 2012, see United States v. Medunjanin, No. 10-CR-019, 2012 WL 1514766 (E.D.N.Y. May 1, 2012), the district court denied the motion. The court ruled that Medunjanin's call to Gottlieb on January 7, 2010, after the agents had seized his passports and departed, did not constitute an invocation of his Miranda rights because Medunjanin was not in custody. See id. at *8. Moreover, it found that Medunjanin's question to Azad at the time of that search--as to whether his attorney had been contacted about the new search warrant--was not a request for counsel; and when Azad responded that Gottlieb had not been contacted but that Medunjanin could contact him, Medunjanin did not do so until after the agents had departed. See id. at *9.

Further, the district court found that even after Medunjanin was arrested, he did not seek to exercise his right to counsel or decline to speak with the agents until late on the afternoon of January 8, after he was indicted. The court found that Medunjanin was repeatedly given Miranda warnings and that he executed three written waivers of his rights. It concluded, in light of the totality of the circumstances, that Medunjanin's waivers were knowing and voluntary. See id. at *11-*12. The court rejected Medunjanin's contention that his will was overborne by the agents' references to his family and to the expense of attorneys' fees. It noted that, despite Medunjanin's initial argument that Medunjanin believed the agents were threatening to arrest members of his family, Medunjanin had abandoned that contention, and his attorneys argued instead that Medunjanin had been

manipulated into believing he had an obligation to family to waive his rights. The court rejected the new argument as contrary to the testimony of the law enforcement agents who had been present; it found no evidence that the agents' conduct was coercive. See id. at *10. The court also found that it was Medunjanin who initiated discussion about whether his attorney was expensive, as he complained about the fees and said he wanted to fire his attorney. See id.

The court found that Medunjanin's first request for counsel came after he learned that the indictment's counts against him included a murder conspiracy charge; only then did Medunjanin indicate unambiguously that he wanted to see Gottlieb. And when he did so, the agents' questioning ceased. See id. at *7, *9.

The district court rejected Medunjanin's contention that, because he was not informed of Gottlieb's attempt to reach him, his Miranda waivers were not made knowingly and his right to counsel was unreasonably impeded. It found that Medunjanin was able to confer with Gottlieb prior to arraignment and that the agents' conduct had no serious effect on Medunjanin's relationship with counsel. See id. at *7, *12.

Following the denial of his motion to suppress, Medunjanin was tried, and his self-incriminating statements were admitted against him. He was convicted on the nine counts described above and was sentenced as indicated.

## II. DISCUSSION

On appeal, Medunjanin seeks a new trial solely on the basis that the district court erred in denying his motion to suppress the postarrest statements he made to law enforcement agents on

January 7 and 8, 2010. He argues principally (1) that the district court (a) erred as a matter of law in ruling that he could not invoke his Miranda rights prior to being in custody, and (b) clearly erred in finding that he did not in fact invoke those rights when the January 7 search warrant was executed; and (2) that the court erred in ruling that his postarrest waivers of his Miranda rights were knowing and voluntary. Medunjanin also argues that his choice to deal with the government through his attorney was clear; that the government's questioning of him without his attorney being present violated his substantive due process rights under the Fifth Amendment; and that the government's interference with his relationship with counsel prior to his indictment ripened into a violation of his rights under the Sixth Amendment upon his indictment.

In reviewing the district court's ruling on a motion to suppress, we review its conclusions of law de novo and its factual findings for clear error. See, e.g., United States v. Oehne, 698 F.3d 119, 121 (2d Cir. 2012). We are not allowed to second-guess the factfinder's credibility assessments, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). Finding no errors in the decision here, we reject Medunjanin's contentions and affirm the judgment of conviction.

A. The Sixth Amendment Right to Counsel

The Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel "exists to protect the accused during trial-type confrontations with the prosecutor." United States v. Gouveia, 467 U.S. 180, 190 (1984). The Supreme Court "ha[s] long

- 13 -

recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." Id. at 187; see, e.g., Kirby v. Illinois, 406 U.S. 682, 688-89 (1972) (plurality opinion) (citing cases, beginning with Powell v. Alabama, 287 U.S. 45 (1932)); Gouveia, 467 U.S. at 188 ("The view that the right to counsel does not attach until the initiation of adversary judicial proceedings has been confirmed by this Court in cases subsequent to Kirby." (citing cases)); McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (Sixth Amendment right to counsel "does not attach until a prosecution is commenced").

The Supreme Court "ha[s] never held that the right to counsel attaches at the time of arrest." Gouveia, 467 U.S. at 190. "[B]efore proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." Davis v. United States, 512 U.S. 452, 457 (1994).

B. Miranda and Its Progeny

The Fifth Amendment to the Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Adopting "procedures which assure that the individual is accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself," Miranda, 384 U.S. at 439, the Miranda Court ruled that

> after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way[,] . . . . [p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed,

id. at 444. These procedural safeguards were intended "to insure that the right against compulsory self-incrimination was protected." Davis, 512 U.S. at 457 (internal quotation marks omitted); see, e.g.,

- 14 -

Gouveia, 467 U.S. at 188 n.5 ("[W]e have made clear that we required counsel in Miranda . . . in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel.").

Once Miranda warnings have been given, if the individual indicates "that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474. See also Edwards, 451 U.S. at 484-85 ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation," he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

"Miranda did not hold, however, that th[e] rights [to remain silent and to have an attorney present] could not be waived." McNeil, 501 U.S. at 176. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444; see, e.g., Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010); Montejo v. Louisiana, 556 U.S. 778, 786 (2009); McNeil, 501 U.S. at 176; Moran v. Burbine, 475 U.S. 412, 421 (1986) ("Burbine"); Edwards, 451 U.S. at 482. In order to conclude that there has been a waiver, the court must find--by a preponderance of the evidence, see, e.g., Colorado v. Connelly, 479 U.S. 157, 168 (1986)--first, that "the relinquishment of the right" was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and, second, that it was made with "the requisite level of comprehension," i.e., "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," Burbine, 475 U.S. at 421. In determining whether or not the relinquishment of the right was voluntary,

knowing, and intelligent, the court must consider "the totality of the circumstances surrounding the interrogation." Id. (internal quotation marks omitted). "A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." Davis, 512 U.S. at 460-61.

There are several prerequisites for preservation of the privilege. First, the privilege must be affirmatively asserted. "It has long been settled that the privilege 'generally is not self-executing' and that a witness who desires its protection 'must claim it.'" Salinas v. Texas, 133 S. Ct. 2174, 2178 (2013) (quoting Minnesota v. Murphy, 465 U.S. 420, 425, 427 (1984) (other internal quotation marks omitted)); see also Berghuis v. Thompkins, 560 U.S. at 375, 381 (defendant's remaining "[l]argely silent" for nearly three hours did not invoke his privilege to remain silent (internal quotation marks omitted)). The mere "likelihood that a suspect would wish counsel to be present is not the test" for whether questioning must cease. McNeil, 501 U.S. at 178 (emphasis in original). "[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney." Burbine, 475 U.S. at 433 n.4 (internal quotation marks omitted) (emphasis in Burbine).

Second, a proper invocation of the right to have an attorney present at questioning "requir[es] a clear assertion of the right to counsel." Davis, 512 U.S. at 460 (emphasis added). "The Edwards rule--[that] questioning must cease if the suspect asks for a lawyer--provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." Id. at 461. "'Maybe I should talk to a lawyer' . . . [i]s not a request for counsel." Id. at 462. Where the suspect makes "an ambiguous or equivocal reference to an attorney" and his statement "fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect," id. at 459, or ask for clarification, see id. at 461.

Third, the right to counsel is personal to the individual questioned; it is a right "that must be affirmatively invoked by the suspect." Id. at 461 (emphasis added). Statements by the suspect's attorney are insufficient to invoke the privilege. See, e.g., Burbine, 475 U.S. at 433 n.4; Coleman v. Hardy, 690 F.3d 811, 818 (7th Cir. 2012) ("The law is clear . . . that an attorney cannot invoke his client's right to counsel under Miranda.").

Finally, a person who wishes to enjoy his constitutional protection against self-incrimination must invoke the privilege--either generally or vis-à-vis a specific question--at the time he is asked to respond or make a statement. See, e.g., Salinas, 133 S. Ct. at 2179. "[T]he 'general rule'" is "that a witness must assert the privilege to subsequently benefit from it." Id. at 2181 (quoting Minnesota v. Murphy, 465 U.S. at 429). However, the Supreme Court has "'never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation."'" Montejo, 556 U.S. at 797 (quoting McNeil, 501 U.S. at 182 n.3). Rather, "[w]hat matters for Miranda and Edwards is what happens when the defendant is approached for interrogation, and . . . what happens during the interrogation . . . ." Montejo, 556 U.S. at 797; see, e.g., United States v. Okatan, 728 F.3d 111, 119-20 (2d Cir. 2013) (Miranda prevents the introduction at trial, during the government's case in chief, of evidence that during a prearrest stop, the defendant, in response to a question the answer to which could have led to his criminal prosecution, stated he wanted an attorney and stopped talking).

C. Application of Miranda to Medunjanin

Applying the above principles to the present case, we see no sound basis for disturbing the district court's conclusion that the government's conduct in the present case did not violate

Medunjanin's Miranda rights.

1. The Purported Assertions of Miranda Rights Prior to Arrest

The district court found that "even if there were a legal basis for recognizing a pre-custodial invocation of the Fifth Amendment right to counsel, [Medunjanin's] actions and statements did not constitute an invocation as a factual matter." 2012 WL 1514766, at *9. We see no error in this finding.

We reject Medunjanin's contention that the requests by Gottlieb that Medunjanin not be questioned without Gottlieb present, in calls to Agent Azad and AUSA Knox in September 2009, constituted effective invocations of Medunjanin's right to counsel. That right was personal to Medunjanin. Only he could waive it; only he could properly invoke it.

The only prearrest mention of counsel by Medunjanin himself came on January 7, 2010, when the second search warrant was served and Medunjanin asked whether Gottlieb had been notified. That question, if intended as a request to have counsel present, was at best unclear and ambiguous.

Thus, even assuming that Miranda rights may properly be asserted by a suspect prior to his being in custody and prior to his being questioned, there was no clear and unambiguous invocation of the right to counsel by Medunjanin before his arrest. Accordingly, the agents' initiation of questioning of Medunjanin after his arrest, and after his receipt of Miranda warnings, did not violate Medunjanin's Fifth Amendment privilege against self-incrimination or his right to counsel in aid of that privilege.

- 18 -

## 2. The Alleged Lack of Voluntariness

After Medunjanin was arrested, he was given Miranda warnings three times; and on each occasion he signed a form stating that he waived his rights to remain silent and to have an attorney present. Medunjanin does not contend that the Miranda warnings were in any way deficient, that he did not understand his rights and the significance of waiving them, or that he did not sign the waivers. Rather, he contends that his signing of the waiver forms was involuntary on the grounds that Detective Murphy "encouraged Mr. Medunjanin to waive his right to counsel for the benefit of his family" (Medunjanin brief on appeal at 42), and that the agents told him his attorney was expensive. Medunjanin contends that the district court clearly erred (1) in finding that Murphy in fact did not advise Medunjanin to waive his Miranda rights because his family wanted or needed him to, and (2) in finding that it was Medunjanin who first raised the issue of attorney expense. We see no basis for reversal.

Although Medunjanin characterizes his "waivers [as] the product of intimidation, coercion and deception" (Medunjanin brief on appeal at 49)--see, e.g., Berghuis v. Thompkins, 560 U.S. at 382-83; Burbine, 475 U.S. at 421--the record does not support his characterization. The only transcript pages cited by Medunjanin in support of the contention that there was intimidation or coercion by Murphy contain testimony by agents describing statements by Murphy that he was a father, that he would want to know if his kids were being investigated by the FBI and would love them, no matter what, but would want to know the truth (see Tr. 94), and that "Medunjanin's parents must be going through a difficult time with the uncertainty resulting from the investigation of their son, and that if Mr. Medunjanin wanted to help his parents, he should accept responsibility for what he had done and tell the truth" (id. at 447).

The district court found the agents' testimony "credible, convincing, and for the most part uncontroverted," 2012 WL 1514766, at *1, and noted that none of the agents testified that Murphy advised Medunjanin to waive his rights because his family wanted or needed him to, see id. at *10. It found that Medunjanin's waivers of his Miranda rights were knowing and voluntary based on the totality of the circumstances--including the evidence that Medunjanin was eager to speak with the agents, repeatedly initiating discussions of religion and politics, that Medunjanin was given sufficient breaks to attend to his personal and religious needs, and that the atmosphere of the interrogations remained friendly and open. See id. at *11. In addition, there was evidence that Medunjanin and the agents dined together; that he delayed going to sleep so that he could compare notes with one of the agents as to their respective military training experiences; and that he was "almost boastful," id. at *5, about the weapons proficiency he had acquired. See id. at *5-*6. The record provides no basis for overturning the district court's conclusion that Medunjanin's will was not overborne.

Nor is there merit in Medunjanin's contention that his signing the Miranda waiver forms was involuntary because the agents told him his attorney was too expensive. Medunjanin suggests that it was illogical for the court to find that he "chose to eschew the assistance of counsel that he had sought and paid for just at the moment when he most needed an attorney" (Medunjanin brief on appeal at 46 (emphasis added)), apparently implying that Medunjanin had a credit balance in his account with Gottlieb. In fact, as revealed by the hearing testimony of Medunjanin's sister, who funded most of Gottlieb's fee, "the retainer fee that [Medunjanin's family] had paid was exhausted even before his arrest," 2012 WL 1514766, at *10. There was no evidence that any assistance Medunjanin needed in January 2010 had already been paid for.

Although Medunjanin also contends that the district court erred in finding that it was

Medunjanin who first raised the matter of attorney expense, there was ample testimony from the agents to support that finding. Medunjanin's argument that the court should have credited other evidence indicating that neither Medunjanin nor his sister was concerned about attorney expense is meritless. We may not disturb the factfinder's credibility assessments or its choices between permissible inferences.

In sum, we find no merit in Medunjanin's challenges to the district court's ruling that his signing the Miranda waiver forms was knowing and voluntary.

D. The Sixth Amendment and Substantive Due Process Arguments

Medunjanin also contends that the government's interference with the attorney-client relationship prior to his indictment ripened into a violation of his Sixth Amendment right to counsel upon his indictment, and that the government's refusal to honor his choice to deal with the government through counsel violated his right to substantive due process under the Fifth Amendment. These contentions do not require extended discussion.

1. The Claimed Violation of the Sixth Amendment

As discussed in Part II.A. above, the right to counsel in a criminal prosecution is conferred by the Sixth Amendment, and that right does not attach until criminal proceedings are initiated. Here, the initial indictment against Medunjanin was handed down on the afternoon of January 8, 2010. Medunjanin was promptly given a form that described the charges and provided a section in which he could indicate whether he wanted to see Gottlieb. He indicated that he did; and questioning immediately ceased. In support of his contention that the government's conduct prior to

his indictment "ripened into" a postindictment violation of his Sixth Amendment right to counsel (Medunjanin brief on appeal at 62), Medunjanin relies on our decision in United States v. Stein, 541 F.3d 130 (2d Cir. 2008). His reliance is misplaced, as the factual circumstances in that case were vastly different from those here.

Stein involved a prosecution of former partners and employees (collectively "employees") of an accounting firm. The defendants reasonably expected the firm to advance and pay their attorneys' fees as a normal perquisite of their employment. See id. at 151. The government, however, was found to have forced the firm to revise its policies, to limit the reimbursable amount of fees and to cease making advance payments of fees upon an employee's indictment. See id. at 143-44. We affirmed the district court's dismissal of the indictments on the ground that, although the government's coercion of the firm occurred prior to the employees' indictments, it plainly affected the employees' rights to counsel after they were indicted. See id. at 153. The government-forced limitations in some instances prevented the defendants from being able to afford their attorneys of choice, and in some instances restricted the services the attorneys could perform. See id. at 157.

There is no such consequence from the government's actions in the present case. Medunjanin was not denied his choice of counsel; he met with Gottlieb prior to his arraignment, and Gottlieb continued to represent him.

Medunjanin's only argument as to a postindictment effect from the preindictment events is that the government was able to use his self-incriminating statements against him at trial. But there was no government interference with Medunjanin's Miranda right to counsel prior to his indictment. A suspect has no constitutional right to have "the police inform [him] of an attorney's efforts to reach him." Burbine, 475 U.S. at 425. Medunjanin was properly advised that his statements

could be used against him and was advised of his rights to remain silent and to have his attorney present. He could have invoked those rights, but he did not. His knowing and voluntary signing of Miranda waiver forms, choosing to speak with the agents and answer questions without Gottlieb being present, does not constitute government interference.

Medunjanin advances an additional contention that the district court should have allowed him to summon AUSA Knox to be questioned at the suppression hearing as to the alleged government interference with Medunjanin's right to counsel. However, Medunjanin has made no showing that Knox could have provided any relevant, noncumulative, or favorable information, see, e.g., United States v. Persico, 645 F.3d 85, 113 (2d Cir. 2011), and we see no abuse of discretion, see, e.g., United States v. Caming, 968 F.2d 232, 238 (2d Cir. 1992), in the district court's denial of the request to call Knox as a witness.

### 2. The Claimed Denial of Substantive Due Process

Finally, Medunjanin complains that the government, in declining to disclose his whereabouts to Gottlieb, failing to inform him that Gottlieb was trying to reach him, and refusing to deal with him solely through Gottlieb, denied him substantive due process. This contention is meritless.

The Fifth Amendment does not provide a right to counsel. The right to counsel in a criminal proceeding is conferred by the Sixth Amendment. As discussed in Part II.B. above, the right to have an attorney present at preindictment custodial questioning was imposed by the Miranda Court in order to insure protection of the explicit Fifth Amendment "right against compulsory self-incrimination," Davis, 512 U.S. at 457 (internal quotation marks omitted).

"The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994) (plurality opinion). The Supreme Court has been reluctant to expand the concept of substantive due process into areas protected by other, more explicit, constitutional provisions. See id. at 271-72 (plurality opinion); id. at 276 (Scalia, J., concurring); id. at 281 (Ginsburg, J., concurring). Thus,

> [w]here a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."

Id. at 273 (plurality opinion) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)); see Albright, 510 U.S. at 276 (Scalia, J., concurring) ("The Bill of Rights sets forth, in the Fifth and Sixth Amendments, procedural guarantees relating to the period before and during trial, including a guarantee (the Grand Jury Clause) regarding the manner of indictment. Those requirements are not to be supplemented through the device of 'substantive due process.'"); United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); Portuondo v. Agard, 529 U.S. 61, 74 (2000) (rejecting habeas petitioner's due process claim that was based on the alleged burdening of his Fifth and Sixth Amendment rights--which the Court determined had not been infringed--because "where an Amendment provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims" (other internal quotation marks omitted)).

Our conclusions above that Medunjanin's rights under the Fifth and Sixth Amendments were not violated foreclose his argument that any impedance of his relationship with his attorney deprived him of substantive due process.

## CONCLUSION

We have considered all of Medunjanin's arguments on this appeal and have found them to be without merit.  The judgment of conviction is affirmed.