17-2087-cr
USA v. O'Brien

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: November 28, 2018                    Decided: June 7, 2019)

Docket No. 17-2087-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

MICHAEL O'BRIEN, AKA Jeremy Soto, AKA Stephen Conte, AKA
George Manolas,

*Defendant-Appellant.*[*]

_____

Before: KEARSE, LIVINGSTON, and CARNEY, *Circuit Judges.*

Appeal from a judgment of the United States District Court for the

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

Eastern District of New York, Roslynn R. Mauskopf, *Judge*, convicting defendant of importing and possessing with intent to distribute methylone and anabolic steroids, *see* 21 U.S.C. §§ 952(b), 960(b)(3), 960(b)(5), 841(a)(1), 841(b)(1)(C), and 841(b)(1)(E), and conspiring to do so, *see id*. §§ 963 and 846; and of operating a stash house, *see id*. §§ 841(a)(1), 856(a)(1) and 856(b). On appeal, defendant principally challenges (a) the denial of his pretrial motion to suppress evidence on the ground that any statements or consent were unknowing and involuntary because he was incapacitated by being in withdrawal from an addictive substance, and (b) the sufficiency of the trial evidence to establish that he knew what he was dealing with was a controlled substance. He also challenges the denial of his posttrial motion to dismiss the indictment on the grounds that methylone was designated a controlled substance pursuant to an unconstitutional delegation of Congressional power to the United States Attorney General, and that the designation process--publication in the Federal Register--did not constitute notice sufficient to afford due process. We find no merit in his contentions.

Affirmed.

MARGARET LEE, Assistant United States Attorney, Brooklyn, New York (Richard P. Donoghue, United States Attorney for the Eastern District of New York, Amy Busa, Assistant United States Attorney, Brooklyn, New York, on the brief), *for Appellee*.

2

SUSAN G. KELLMAN, Brooklyn, New York (Sarah Kunstler, Offices of Susan G. Kellman, Brooklyn, New York, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Michael O'Brien appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Roslynn R. Mauskopf, *Judge*, convicting him of five drug trafficking offenses, to wit, importing methylone and anabolic steroids, and conspiring to do so, in violation of 21 U.S.C. §§ 952(b), 960(b)(3), 960(b)(5), and 963 (Counts Two and One); possessing with intent to distribute those substances, and conspiring to do so, in violation of *id*. §§ 841(a)(1), 841(b)(1)(C), 841(b)(1)(E), and 846 (Counts Four and Three); and operating a stash house, in violation of *id*. §§ 841(a)(1), 856(a)(1), and 856(b) (Count Five); and sentencing him principally to 144 months' imprisonment, to be followed by a five-year term of supervised release. On appeal, O'Brien contends principally (a) that the district court erred in denying his pretrial motion to suppress, on Fourth and Fifth Amendment grounds, his postarrest statements and evidence seized from his apartments, arguing that his statements and any consents to search

were unknowing and involuntary because he was incapacitated by his addiction to and withdrawal from a human growth hormone called Gamma-Hydroxybutyrate ("GHB"); and (b) that the evidence at trial was insufficient to establish that he knew the substances he was importing and possessing for distribution were controlled substances. He also contends that the designation of methylone as a controlled substance, making trafficking in that substance unlawful, was implemented through an unconstitutional delegation of Congress's legislative power to the United States Attorney General, and that the designation process--publication in the Federal Register--did not constitute notice sufficient to afford due process. Finding no merit in his contentions, we affirm the judgment.

## I. BACKGROUND

The present prosecution had its origin in seizures on September 20, 2013, by United States Customs and Border Protection ("CBP") officers, of three packages at the mail facility of John F. Kennedy International Airport, each addressed to a different person--none of them O'Brien--at the locations of different mailbox stores in Brooklyn, New York. Each package was field-tested and found to contain

approximately one kilogram of methylone (commonly referred to as "Molly"). CBP informed agents of Homeland Security Investigation ("HSI"), who took possession of the packages.

HSI agents replaced the methylone in each intercepted package with a sham substance, and they conducted controlled deliveries on September 23. One of the addressees, Kimberly Ruud, arrived at the mailbox store to which a seized package had been sent to a different addressee; she picked up that package, along with a nonintercepted package that was addressed to her, and began to drive away. Ruud was stopped and arrested. She consented to a search of her car. In addition to the two packages she had just collected, which were in the car's passenger area, agents found, *inter alia*, four packages in the trunk and two cellphones. Although the labels on the packages identified their respective contents as various uncontrolled substances, the six packages contained a total of nearly three kilograms of methylone and nearly three kilograms of anabolic steroids. An ensuing search of Ruud's cellphones revealed a series of communications on September 23 with a contact listed as "Big," who was eventually identified as O'Brien.

A. *The October 10, 2013 Arrest of O'Brien*

On October 10, 2013, pursuant to a 2011 New York State bench warrant issued by the Suffolk County Superior Court ("county court") for the arrest of O'Brien on a firearms charge on which he had pleaded guilty but had become a fugitive, O'Brien was arrested by members of a state-and-federal task force that included HSI Special Agent Vincent Marino and Special Agent Edward Alahverdian of the United States Drug Enforcement Administration ("DEA"). The arrest warrant was executed at O'Brien's apartment on College Point Boulevard in Queens, New York (the "College Point Apartment" or "Apartment").

As set out in greater detail in Part I.B. below, after O'Brien was arrested and handcuffed, he was given *Miranda* warnings by Alahverdian. O'Brien said that he understood his rights and was willing to answer some questions; and when Alahverdian asked whether the agents could search the apartment, O'Brien said they could look anywhere they wanted. Searching the Apartment pursuant to that consent, the agents found, *inter alia*, several kinds of drug paraphernalia, including lists of anabolic steroid chemicals; vials of a liquid labeled "Genzyme" (a steroid brand name) and hundreds of sheets of additional "Genzyme" labels; currency-counting machines and more than $10,000 in cash; 18 cellphones and 12 laptop computers;

identification documents in various names, along with blank identification cards and an identification-card printer; applications and receipts for mailbox rentals at mailbox stores throughout Brooklyn; 27 airway bills for packages mailed from China; and a ledger with annotated lists of anabolic steroids, locations, and phone numbers for pick-up.

In the meantime, O'Brien was driven to a police precinct in Suffolk County by Alahverdian, Marino, and a Suffolk County police officer. During the drive, O'Brien was talkative, stating that he made purchases of methylone and anabolic steroids from China online (describing the brand and color of the computer he used for that operation), and explaining that he had people in the United States rent local mailboxes and collect the packages he was importing.

After their arrival at the precinct, Alahverdian and Marino formally interviewed O'Brien. Marino stated that the agents knew O'Brien had a "stash house" in an apartment at 132-35 41st Road in Queens ("41st Road"), and asked for his consent to search it. After Marino read a Department of Homeland Security, U.S. Immigration and Customs Enforcement ("DHS/ICE") consent form aloud and gave it to O'Brien to read, O'Brien signed it. The form signed by O'Brien states as follows:

7

I, Michael O'Brien, have been informed by U.S. Immigration and Customs Enforcement (ICE) Special Agent Vincent Marino of my right to refuse to consent to a search of my property, described as: . . .

> Computer, phones
> 132-35 41st Rd Apt 5E
> 40-22 College Pt. Blvd 3PHR

> I have also been advised by ICE Special Agent Marino that, if I voluntarily consent to a search of this property, anything discovered during this search may be used against me in criminal, civil, or administrative proceedings.

> I have decided to allow ICE Special Agents Vincent Marino and Homeland Security Special Agents . . . to conduct a complete search of my apartments, located at 40-22 College Point Blvd PH3R / 132-35 41st Road, Queens Apt 5E. These ICE Special Agents are authorized by me to take any letters, papers, materials or other property which they may desire to examine.

> I hereby voluntarily and intentionally consent to allow ICE to search my property. My consent is freely given and not the result of any promises, threats, coercion or other intimidation. **I have read the above statement and understand my rights.**

(Consent To Search dated October 10, 2013 (O'Brien's "Written Consent To Search" (bolding in original)), attached to Affidavit of Michael O'Brien dated April 30, 2019 [*sic*] ("O'Brien Suppression Motion Aff."), in support of motion to suppress.)

Based on this written consent, law enforcement agents searched the 41st Road apartment and found, *inter alia*, numerous pills, powders, and jugs of liquid,

8

and approximately 11 kilograms of methylone.  In addition, pursuant to a search warrant, HSI Special Agent Joshua Schottenfeld, who had participated in the search of the College Point Apartment, searched the computer that O'Brien told Alahverdian and Marino he used to order methylone and anabolic steroids from China.  That computer contained receipts and a web browser history of orders from a website offering legal and illegal items, including narcotics.

After O'Brien signed the written consent form at the police precinct, he was taken to the county court pursuant to the bench warrant issued for his arrest as a fugitive.  In that court proceeding, the prosecutor asked that bail be denied, noting that O'Brien apparently had access to large amounts of cash, as the search of his apartment at the time of his arrest found "lots of pills" and "kilos of cocaine" (*People v. O'Brien*, No. 2456-2009, Superior Court of the State of New York, County of Suffolk, October 10, 2013 ("County Court Transcript"), at 2-3).  The court noted that it had issued the bench warrant for O'Brien's arrest in May 2011 and that O'Brien had remained a fugitive for more than two years, and it ruled that bail would thus be denied.

O'Brien's attorney then informed the court that O'Brien needed medical attention because he was addicted to GHB. O'Brien himself stated that the full name

9

of GHB was Gamma-Hydroxybutyrate and explained its nature and effects. The proceeding ended with the court's scheduling O'Brien's next appearance.

Following that county court proceeding, O'Brien was admitted to a nearby medical center, where he remained for five days, prior to being sent to the Suffolk County Jail. Some days thereafter, he was released on bail.

On October 29, 2013, O'Brien was charged in a one-count federal criminal complaint with conspiracy to import methylone and was arrested by federal authorities. He was indicted in November on the present five narcotics trafficking counts.

B. *The Suppression Motion*

In April 2014, O'Brien moved to suppress his October 10, 2013 postarrest statements and the items seized in the searches of his apartments. His supporting affidavit stated, *inter alia*, that when he was arrested on October 10, he was under the influence of GHB and was addicted to it; that he had so advised the arresting agents; and that he repeatedly told them that if he was not promptly taken to a medical facility he was in danger of detoxification death. (*See* O'Brien Aff. ¶ 3.) O'Brien stated that he did not remember receiving *Miranda* warnings on October 10, and that no one

read those rights to him that day (*see id*. ¶ 10); that he "ha[d] no recollection of giving [his] consent to law enforcement to search" the College Point Apartment or the 41st Road apartment (*id*. ¶ 6; *see id*. ¶ 5); and that because he was in withdrawal from GHB at the time of his arrest, he lacked the capacity to waive his *Miranda* rights or to consent to searches (*see id*. ¶ 10). He stated that the signature on the Written Consent To Search form was not his. (*See id*. ¶ 6.)

The district court conducted a hearing on O'Brien's suppression motion on August 13 and 22, 2014. The government called as witnesses Alahverdian and Schottenfeld; O'Brien testified and called Marino as a witness.

1. *The Testimony of Alahverdian*

Alahverdian testified that when he first saw O'Brien on October 10, 2013, O'Brien had already been arrested and was in handcuffs, sitting on a couch in his living room. Also in the living room was Marino. Alahverdian approached and introduced himself to O'Brien, who seemed eager to talk to the two agents. Alahverdian said O'Brien would "have to wait" until he received *Miranda* warnings and would have to deal with the local authorities about the state warrant on which he had just been arrested. (Hearing Transcript, August 13, 2014 ("Aug. 13 Tr."),

11

at 11-12; *see also id.* at 14 (Alahverdian told O'Brien "we just have to get through this and then I'm willing to listen to anything you have to say").)

Alahverdian, with Marino present, read the *Miranda* warnings aloud and asked whether O'Brien understood and whether he was willing to answer some questions; O'Brien said yes to both and seemed a little excited. (*See id.* at 14-15.) When Alahverdian asked whether the agents could search the apartment, "[O'Brien] said, yeah, you can look anywhere you want." (*Id*. at 16.)

After receiving this oral consent to search, Alahverdian relayed it to his supervising officer and then returned to the living room; at that point, O'Brien told Alahverdian and Marino that he was addicted to GHB, that he ingested it daily, and he asked to be allowed to take some immediately. (*See id.* at 17 ("He asked for a cup of GHB.").) O'Brien told them that if he did not get his dosage of GHB "he would get sick"; but he did not say he needed to be taken to a hospital. (*Id*. at 46.) Alahverdian and Marino told O'Brien that he could not be given GHB because it is a controlled substance. (*See id.* at 17-18, 46.) O'Brien then asked if he could take a Valium pill and told Marino where to find one. Alahverdian, after briefly stepping away again to confer with his supervisor and returning to the living room, inferred that Marino had allowed O'Brien to take a Valium because he heard O'Brien thanking Marino. (*See id.*

at 18, 47; *see also* Hearing Transcript, August 22, 2014 ("Aug. 22 Tr."), at 12-13.)

Alahverdian testified that during the time he and Marino were in the College Point Apartment with O'Brien, O'Brien was "very talkative" and "was very alert." (Aug. 13 Tr. 18; *see id.* at 29.) O'Brien was not slurring his words in any way, and Alahverdian saw no indication that he was undergoing withdrawal. (*See id.* at 19.) During the drive from the Apartment to the police precinct in Suffolk County, O'Brien continued to be talkative, describing "using his black Acer computer" to "order[] Molly" on "websites like Ali Baba and Silk Road," and have it shipped to the United States. (*Id*. at 20-21.)

When they arrived at the precinct, O'Brien asked to have a cigarette and was allowed to smoke before entering the building. He thanked Alahverdian and Marino for treating him with courtesy and consideration. (*See* Aug. 13 Tr. 21-22.) After entering the precinct, Alahverdian, Marino, and O'Brien went into an interview room, where O'Brien was asked for consent to search his 41st Road stash pad. The DHS/ICE consent form was read to him, listing items and places to be searched; O'Brien did not ask any questions or give any indication that he did not understand. (*See id.* at 26.) He was given the form to read and was told that he had the right to refuse consent; he signed the form without indicating that he wished to refuse. (*See*,

*e.g., id.* at 26-29, 52-54, 63-64; *see also id.* at 54 (after looking at the consent-to-search form, O'Brien signed it, saying "yeah, it's okay or yes").

When Alahverdian asked O'Brien what the agents were likely to find in searching the 41st Road premises, O'Brien said there might be some steroids and that there were about 10 kilograms of methylone. When Alahverdian sought details of the operation, O'Brien said that, per kilo, he was buying methylone for about $1,900 and selling it for $30,000. He again described ordering methylone online from China, having it sent to local mailbox store addresses, and then having his people pick up the packages for him. (*See* Aug. 13 Tr. 27, 29-30.)

Alahverdian testified that after leaving the College Point Apartment, O'Brien had made no further mention of his addiction to GHB nor any mention of symptoms of withdrawal. (*See id.* at 27-29, 31-32, 61.) During his entire conversation with Alahverdian and Marino, O'Brien was talkative and pleasant and appeared to have no difficulty focusing on the agents' questions, or understanding them, or communicating. Alahverdian did not notice anything unusual about O'Brien's behavior. (*See id.* at 32.)

14

## 2. *The Testimony of Schottenfeld*

Schottenfeld testified principally about the evidence found on O'Brien's computer (described in Part I.A. above) and about two recorded statements O'Brien made to persons other than Alahverdian and Marino. First, Schottenfeld read the following part of the October 10 county court transcript that followed the court's refusal to grant O'Brien bail and encompassed the entire discussion of O'Brien's physical condition:

> Ms. Gearrity [O'Brien's then-attorney]: Judge, he has a serious GHB addiction, so we're going to need medical attention.
>
> The Court: All right. Medical attention. What's G.H.B.?
>
> The Defendant: Um, your Honor, it's--it's detrimental, it's fatal.
>
> Ms. Gearrity: What's the name of it?
>
> The Defendant: Gamma hydroxybutyrate. It's a chemical that goes in the body and reduces your dopamine levels. When coming off of it, it will actually start firing dopamine, increasing my heart rate and I'll go into cardiac arrest if I don't get the proper treatment.
>
> The Court: All right. I'll mark it medical attention.

(Aug. 13 Tr. 82 (*see* County Court Oct. 10 Transcript at 3-4).)

15

Second, Schottenfeld testified that he had listened to consensually recorded telephone calls made by O'Brien from the county jail. Schottenfeld identified a "CD [that] comes from the jail stating it's Mr. O'Brien" (Aug. 13 Tr. 87), which contained an October 16, 2013 conversation between O'Brien and a woman later identified as his ex-fiancée (*see* Aug. 22 Tr. 68). The CD was introduced and played for the court. (*See* Aug. 13 Tr. 83-84.) Although it does not appear that the record contains a transcript of the CD, O'Brien's own testimony--on cross-examination at the August 22 session of the suppression hearing--as to what he said in that recorded conversation was, in part, as follows:

> Q. You told her that the agents came in, and they were like, well, we don't actually have a search warrant for your house, so, but we could get one. So you know, you want to let us look around. *And I said, go ahead, feel free, I said, go ahead take a look.* Is that correct?

> A. *That's correct.*

> Q. *And is that an accurate reflection of what happened in your apartment?*

> A. *I would say so.*

> Q. *That they told you, that they didn't have a search warrant, and asked for permission to search and you said, go ahead; is that correct?*

A. *That's correct.*

(Aug. 22 Tr. 68-69 (emphases added).)

3. *The Testimony of Marino*

Marino, called as a witness by O'Brien, testified principally as follows. When Marino first saw O'Brien at the College Point Apartment on October 10, O'Brien had already been handcuffed. (*See* Aug. 22 Tr. 6-7.) After Marino and Alahverdian introduced themselves as federal officers, O'Brien responded "Okay" and said that he was prepared to help, which Marino understood to mean that O'Brien sought to avoid imprisonment by providing information. (*See id.* at 29.) Alahverdian then read O'Brien the *Miranda* warnings; O'Brien said he understood those rights. (*See id.* at 30.) O'Brien said he was willing to speak to the agents, and he orally gave consent for the search of the Apartment. (*See id.* at 10 ("I asked him if we were okay to search and he said go right ahead.").)

After O'Brien "had given [the agents] consent to search the apartment, . . . then he advised that he was addicted to the Ghb and the anabolic steroids." (*Id.* at 10.) O'Brien also "advised [the agents] he was very eager to assist us in the investigations" (*id.* at 11-12), and expressed his eagerness to stay out of jail, reiterating

17

"throughout the course of the day" that "in order to most help out law enforcement," "he would need to be out in the street" (*id*. at 34).

As to his addiction, O'Brien said he had taken GHB that morning and asked whether he could take more. When Marino replied that that would not be permitted, O'Brien said that "if that d[id]n't happen, [he] c[ould] get very sick"; Marino testified, "I don't know if he used the word 'die,' but" it was either "'sick' or 'die'." (*Id*. at 12.) O'Brien did not, however, say he was experiencing any symptoms at that time (*see id.* at 32), and Marino understood him to be saying that he would have problems in the future (*see id.* at 13). O'Brien asked, if he would not be allowed more GHB, whether Marino would let him have a Valium--and pointed to a pill next to a prescription bottle--explaining that Valium would help in "counteracting" the GHB (*id*. at 12). Marino testified that although it was certainly not standard procedure, he let O'Brien have a Valium pill because O'Brien seemed "sincere." (*Id*. at 13 ("It sounded like he was legitimate.").)

When O'Brien disclosed his GHB addiction, he did not elaborate and "[h]e was not complaining of anything"; "[h]e was fine." (*Id*. at 17.) He was calm, was not slurring his words, and was having no difficulty speaking. (*See id.* at 30-32.) He also exhibited no difficulty in understanding the agents' questions, or focusing, or

18

staying awake. (*See id.* 29, 39.) Although O'Brien's hands were "slightly shaking" at the outset, Marino testified that he attributed that simply to O'Brien's being arrested; he "asked [O'Brien] a couple of times throughout the interview if he was feeling okay and he said he was fine. . . . There was nothing out of the ordinary." (*Id.* at 33.)

There was no point in the day when O'Brien did not appear to be lucid, or when he did not understand what was going on, or when the agents had any difficulty communicating with him. (*See id.* at 36-37.) After the agents and O'Brien left the Apartment and were on the way to the police precinct in Suffolk County, O'Brien did not exhibit any symptoms of possible withdrawal or intoxication and was speaking freely (*see id.* at 34), giving the agents details about his drug importation operation.

> He advised that he had a black Acer computer that had on the computer all his information from the purchases he made from China because he was selling large amounts of Molly . . . . He said that he also used websites such as Ali Baba and Silk Road and there would be conversations and receipts on that computer. He also admitted to having paid an individual [named] Wagner $200 for every time he picked up a box of Molly from a mailbox store [that O'Brien had had him open] in [Wagner's] name.

(*Id.* at 15-16.)

In the interview room at the police precinct, Marino told O'Brien that the agents knew about O'Brien's stash house at 41st Road: "I said we knew about the stash house and the location. *I said I would like to search it. He said okay*." (*Id*. at 19 (emphases added).) Asked what the agents would find in that search, O'Brien responded, "[m]ultiple vials of steroids and probably about 10 keys of Molly." (*Id*.; *see also* Aug. 13 Tr. 30 ("key" is used as slang for kilogram).)

Marino then filled out the DHS/ICE consent form (quoted in full in Part I.A. above), read it to O'Brien and went over it with him. Marino informed O'Brien "that he had a right to refuse to consent to search his computer, his phones, the apartment at 41st Road and the College Point Boulevard apartment." (Aug. 22 Tr. 21.) O'Brien did not in any way indicate that he wished to refuse consent. (*See id.* at 35.)

4. *The Testimony of O'Brien*

O'Brien testified at the suppression hearing and largely denied that he had given the above consents to search. He said that when he met Marino, he immediately told the agents that they needed to get him to a hospital within four hours or he would die. He also testified that he told the agents of his need for medical attention three times during the approximately 20 minutes they were in the

20

College Point Apartment, and that later that day he so informed the county court.

O'Brien testified that he remembered speaking to Marino, but he did not remember speaking to, or even seeing, Alahverdian that day. (*See* Aug. 22 Tr. at 43, 63.) O'Brien did not remember, *inter alia*, receiving *Miranda* warnings (*see id.* at 45, 67) or signing the DHS/ICE consent form attached to his Suppression Motion Affidavit (*see id.* at 51). Notwithstanding his claimed inability to remember several events of October 10, O'Brien said "I can testify . . . , swear up and down," that "I have never had a conversation about th[e DHS/ICE] form." (*Id.*) O'Brien noted that his arrest on October 10, 2013, was pursuant to a state warrant, and he testified that at "[n]o time did [he] invite [Marino] to go collecting evidence on an outside case." (*Id.* at 44; *see id.* at 51 ("The only consent that I gave, was to look around the College Point location, they were asking about guns. I told them there are no guns in this property. You can look around."); *but see id.* at 67 (O'Brien "d[id]n't remember giving them consent to search [the College Point Apartment]").)

O'Brien denied signing the Written Consent To Search form at the police precinct as Marino and Alahverdian described. First, O'Brien testified that in fact he was not taken to a precinct but had instead been driven from the Apartment directly to the county courthouse. (*See id.* at 47.) In addition, he testified that he never gave

21

a written consent to search. (*See id.* at 45, 53; *see also* O'Brien Aff. ¶ 6 (the "signature" on the "Consent to Search Form . . . . is not mine").) However, he also testified to having a "fuzzy" recollection of being visited by Marino and Alahverdian in the hospital while he was "in and out of" a "coma," and he "deduce[d] that that is where they had me sign the consent to search form" (Aug. 22 Tr. 49-50).

O'Brien admitted that in the postarrest car ride from the College Point Apartment he told the agents he had a black Acer computer at the Apartment. He also admitted that he had in fact used the Ali Baba website; but he denied that he so told the agents. (*See id.* at 75-76.) O'Brien also admitted that during that drive he told the agents about the 41st Road stash pad. "I told them there were steroids there and . . . maybe some molly . . . ." (*Id*. at 53.) However, he testified that "at no time did the[ agents] ask [him] for consent to search the [41st Road] apartment" and that he "never gave consent." (*Id*.)

As to his physical condition, O'Brien testified that, although he could normally sleep 3-4 hours without being awakened by GHB withdrawal symptoms (*see id.* at 42, 77-78), on October 10 he began experiencing GHB withdrawal symptoms when he was being taken down in the elevator from the Apartment, which was some 30-35 minutes after he had last taken GHB (*see, e.g., id.* at 60 (his "arrest . . . was about

22

15 minutes [after his] last dose")).  He said he was taken to the county courthouse, a trip that took about 1½ hours, and that when they arrived he could not walk without staggering (*see id.* at 47). O'Brien testified "seizure was running through my body, my entire body was shaking, my hands shaking" "as [he was] standing before the Suffolk County Judge" (*id*. at 58).

O'Brien acknowledged that his then-attorney said nothing to the court early in the hearing about his addiction or any withdrawal symptoms.  It was not until the court said that bail would be denied that she raised that subject.  (*See* Aug. 22 Tr. 79-80.)  He said that after the county court denied him bail,

> I asked for medical attention there, in the Court, in the courtroom. Judge Efman had to finish my sentence for me as I was asking for medical attention, because I was seizure-ing.  I could not come out with the words.  Judge finished the sentence, you need medical attention, I said, yes, sir.

(*Id*. at 48.)  He testified that "despite the clarity of the [county court] transcripts," he "had a massive seizure" on October 10 "right there in open court."  (*Id*. at 47-48.)

While claiming to have been unable to find the words "medical attention," O'Brien did not dispute that he had been able to tell the court that GHB stood for "Gamma Hydroxybutyrate" and to explain its chemical effects on the body (*id*. at 80; *see id.* at 81-82).  O'Brien admitted that had been "able to understand" with

23

"no difficulty . . . what was going on" in that proceeding; and he acknowledged that the transcript contains no indication that he was shaking, staggering, falling, having a seizure, or unable to articulate. (*Id*. at 81-82.)

5. *The District Court's Decision*

In a decision announced on the record on March 20, 2015, the district court denied O'Brien's suppression motion. (*See* Status Conference Transcript March 20, 2015 ("Suppression Motion Decision").) The court concluded, based on the totality of the circumstances credibly shown by the record, that the government had carried its burden of proving that on October 10, 2013, O'Brien made the various statements attributed to him pursuant to valid *Miranda* waivers; that the searches at issue were authorized by O'Brien's voluntary consent, first oral and then written; and that while the Written Consent To Search was not a model of clarity, even read in the light most favorable to O'Brien it encompassed everything found in his two apartments, including his computers and phones.

The court found that the agents who testified at the suppression hearing were credible witnesses, based principally on their demeanor, their experience, and the content of their testimony. In addition, the court found that Marino's credibility

24

was enhanced by his candor in admitting that he had allowed O'Brien to take a Valium, an admission that "was . . . not necessarily in [Marino's] best interest," *id.* at 4. The court found that *Miranda* warnings were properly administered at the College Point Apartment; it credited the testimony of Alahverdian and Marino that O'Brien appeared to be calm, lucid, talkative, and "cogently answering questions, giving the agents detailed information" in "wanting to help get himself out of this situation," and that the agents saw no signs that O'Brien was undergoing withdrawal. *Id.* at 8.

The district court rejected O'Brien's claim that he had been incapable of consenting to searches of his properties on October 10 because of withdrawal from GHB. It found that his testimony lacked credibility "in significant part, if not in whole," *id.* at 4; *see id.* at 5-6 ("much of his testimony was belied by every other piece of evidence in the case," including being inconsistent with "his premotion affidavit" and with "the jail call that he made to his girlfriend"). The court also noted that the transcript of O'Brien's October 10 appearance in county court showed that O'Brien

> was in control of his faculties [and] was explaining in detail to Judge Ef[]man the potential [e]ffects of GHB withdrawal . . . [O'Brien] was being his own very effective advocate . . . which demonstrates now probably hours after [his] last hit of GHB that he was not suffering in any way, shape, or form from any type . . . of withdrawal that could affect his ability to knowingly and voluntarily waive his *Miranda* rights or consent to any of the searches.

25

*Id.* at 8-9. The court rejected as "incredible" O'Brien's assertion that he had a seizure right after the court reporter stopped recording the proceedings. *Id.* at 9.

The court also found "no evidence in the hospital records to corroborate [O'Brien's] story" that he had a seizure, went into a coma, and was largely unconscious for the next several days. *Id.* at 10. It noted that those medical records themselves commented "that his stay was, quote, unremarkable." *Id.* The court found that O'Brien's "notion that the consent form was signed at the hospital while [he] was in a coma" was belied by all of the other evidence in the case, as well as being "completely implausible." *Id.* at 5.

In sum, the district court stated, "I find that the [e]ffects of GHB, whatever they were on the defendant, did not in any way undermine the defendant's knowing and voluntary consent to search, the oral consent at College Point, and the written consent for both College Point and 41st Road, or the waiver of his *Miranda* rights," *id.* at 10.

C. *The Trial, and O'Brien's Posttrial Motions*

In May 2015, with the start of his trial about two months away, O'Brien, who had been represented by counsel throughout the pretrial proceedings, elected

to represent himself at trial. The court, after conducting a *Faretta* inquiry, *see Faretta v. California*, 422 U.S. 806, 835 (1975), allowed him to proceed *pro se*, with standby counsel. On July 28, 2015, the sixth day of trial, the jury found O'Brien guilty on all five of the counts against him.

After the jury verdict, O'Brien decided that he no longer wanted to proceed *pro se*, and counsel was appointed to represent him. However, on August 11, 2015, O'Brien again decided that he wanted to proceed *pro se*; and again, after appropriate *Faretta* warnings, he was allowed to do so with standby counsel. In this new *pro se* period, O'Brien unsuccessfully moved for acquittal on the ground that the evidence was insufficient to show that he had any connection to the 41st Road apartment in which, *inter alia*, 11 kilograms of methylone had been found. Thereafter, while still *pro se*, O'Brien also moved, as discussed in Part II.C. below, for acquittal on the ground that methylone was designated a controlled substance pursuant to an unconstitutional delegation of Congress's legislative power. That motion too was denied.

In June 2017, O'Brien decided that he wished to be represented by counsel again, and counsel was appointed to represent him in connection with sentencing.

## II. DISCUSSION

On appeal, O'Brien principally challenges (A) the district court's denial of his pretrial motion to suppress his postarrest statements and the physical evidence that was seized, (B) the sufficiency of the trial evidence to show that he knew methylone was a controlled substance, and (C) the denial of his posttrial motion to dismiss the indictment on the ground that the process that led to the designation of methylone as a controlled substance was unconstitutional. For the reasons that follow, we reject all of his contentions.

A. *The Denial of O'Brien's Motion To Suppress*

O'Brien contends that his October 10, 2013 postarrest statements should have been suppressed on the ground that, as he was undergoing withdrawal from GHB, he was incapable of knowingly or voluntarily waiving his Fifth Amendment privilege against self-incrimination. He contends that the physical evidence seized in searching his College Point and 41st Road apartments should have been suppressed as violative of his rights under the Fourth Amendment on the ground that he did not give voluntary consent for those searches, either because of his claimed

28

incapacitation by GHB withdrawal or because, he contends, the actions of the agents were coercive and he was not informed of his right to refuse consent to search.

In considering challenges to the denial of a suppression motion, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. *See, e.g., United States v. Medunjanin*, 752 F.3d 576, 584 (2d Cir.) ("*Medunjanin*"), *cert. denied*, 135 S. Ct. 301 (2014). In conducting clear-error review, "[w]e are not allowed to second-guess the [court's] credibility assessments, and '[w]here there are two permissible views of the evidence, the [court's] choice between them cannot be clearly erroneous.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985)); *see, e.g., United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004) ("*Isiofia*"). In reviewing the denial of a defendant's motion to suppress, we view the record in the light most favorable to the government. *See, e.g., United States v. Moore*, 670 F.3d 222, 226 (2d Cir. 2012) (denial of motion to suppress postarrest statements); *United States v. Moreno*, 701 F.3d 64, 72 (2d Cir. 2012) (denial of motion to suppress evidence seized in a search premised on consent). We see no error in the district court's denial of O'Brien's suppression motion.

1. *O'Brien's Postarrest Statements*

"Once *Miranda* warnings have been given, if the individual indicates 'that he wishes to remain silent, the interrogation must cease.'" *Medunjanin*, 752 F.3d at 585 (quoting *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) ("Police are not required to <u>re</u>warn suspects from time to time." (emphasis added)). In order to require that questioning cease, the accused must assert his right affirmatively and unambiguously. *See*, *e.g.*, *id.* at 381 (accused's merely remaining "[l]argely silent" for some three hours did not invoke his privilege to remain silent sufficiently to require that the officers refrain from questioning him (internal quotation marks omitted)). Where the accused "did not" say unambiguously either "that he wanted to remain silent or that he did not want to talk with the police, . . . . he did not invoke his right to remain silent." *Id.* at 382.

Nonetheless, an "accused's statement during a custodial interrogation is inadmissable at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived his [*Miranda*] rights' when making the statement." *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Such a "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,'" and must be "knowing[]" in the sense that

it was "'made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("*Burbine*") (emphasis ours)). "'[A]s *Miranda* holds, full comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process.'" *Berghuis*, 560 U.S. at 382 (quoting *Burbine*, 475 U.S. at 427).

The waiver need not have been express; "courts can infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'" *Berghuis*, 560 U.S. at 387 (quoting *Butler*, 441 U.S. at 373). The prosecution need prove waiver only "by a preponderance of the evidence," and it may be inferred "from all the circumstances." *Berghuis*, 560 U.S. at 384. "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at 388-89.

In the present case, as described in Part I.B.5. above, the district court-- crediting the hearing testimony of Alahverdian and Marino, as it was entitled to do-- found that proper *Miranda* warnings were administered to O'Brien at the College Point Apartment, that he understood his rights, and that he knowingly and voluntarily waived them. The finding as to O'Brien's comprehension of the *Miranda*

31

warnings was supported by, *inter alia*, the agents' testimony that O'Brien was alert, focused, and never evinced any difficulty understanding the agents or communicating with them, and that he said he understood those rights when they were read to him.

The evidence supporting the finding that O'Brien's ensuing statements were voluntary included the testimony of the agents, described in Parts I.B.1. and I.B.3. above, that (a) after receiving his *Miranda* warnings O'Brien said he was willing to talk with the agents, (b) he had in fact expressed eagerness to provide them with information immediately upon meeting them and was temporarily halted only because Alahverdian insisted on giving him *Miranda* warnings first, and (c) after receiving his *Miranda* warnings, O'Brien was extremely talkative and informative, freely giving the agents numerous details about the workings of his methylone and anabolic steroids operation. O'Brien himself has never asserted--in his affidavit, or in his suppression hearing testimony, or in his brief on appeal--that he ever told the agents he wished to remain silent or he did not want to talk with them.

The court was not required to reach contrary conclusions on the basis of O'Brien's testimony that he did not remember being given *Miranda* warnings on October 10. The court found it clear that the warnings had in fact been given, *see*

32

Suppression Motion Decision at 7; and O'Brien's professed inability to remember the reading of *Miranda* warnings--which had interrupted his initial attempt to cooperate in an effort to avoid imprisonment--was implausible at best. The court noted that O'Brien's similar assertions that he did not remember giving permission that day to search the College Point Apartment (*see* Aug. 22 Tr. 67; O'Brien Aff. ¶ 6) were not credible in light of his recorded October 16 telephone call from jail to his ex-fiancée (*see* Suppression Motion Decision at 5-6), in which O'Brien said that the agents had asked for permission to search the Apartment and he had said, "go ahead" (Aug. 13 Tr. 83-84).

The present record also fully supports the court's finding that O'Brien's ability to understand his Fifth Amendment rights and forgo them voluntarily was not impeded by his addiction to GHB. O'Brien's reliance on this Court's decision in *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014), for the contrary conclusion is misplaced. In that case, in which the defendant apparently had attempted to commit suicide by ingesting a large number of pills as he was arrested, we reversed the denial of a suppression motion where the record showed, *inter alia*, that "*Taylor was largely stupefied* when he made his post-arrest statements, *as confirmed by the testimony of the law enforcement agents and the pretrial services officer who interviewed him*, and *by the*

33

*evaluations of staff psychologists at the Metropolitan Correctional Center*," *id.* at 20 (emphases added); that "*all* the witnesses support[ed] the account that *Taylor was actually slipping in and out of consciousness* during [his first] interview, and immediately before and after the [second] interview," *id.* at 26 n.3 (emphases added); and that it was "*clear to the officers (as their testimony confirm[ed])* that Taylor was in and out of consciousness while giving his statement, and *in a trance or a stupor most of the time when not actually asleep*," *id.* at 25 (emphases added).

Here, in contrast, no one testified that O'Brien was somnolent or in a stupor or not fully conscious during his dealings with Alahverdian and Marino. The agents testified squarely to the contrary. (*See, e.g.,* Aug. 22 Tr. 34 (Marino: O'Brien did not appear to have had any difficulty staying awake); Aug. 13 Tr. 29 (Alahverdian: O'Brien appeared to have no difficulty at all focusing on or understanding the agents' questions).) Alahverdian also testified that O'Brien was "very talkative" and "very alert" (Aug. 13 Tr. 18); and Marino testified that O'Brien was calm and coherent, speaking freely, and was lucid throughout the day (Aug. 22 Tr. 12, 31-32, 36).

O'Brien's own representations as to his condition were inconsistent. For example, in his affidavit, O'Brien said he was in withdrawal from GHB at the time of

his arrest. (*See* O'Brien Aff. ¶ 10.) Yet there is no dispute that after O'Brien's arrest, Alahverdian and Marino were in O'Brien's College Point Apartment for some 20 minutes before taking him downstairs for the drive to Suffolk County; and O'Brien testified at the suppression hearing "not until I went downstairs, that is when the withdrawal began" (Aug. 22 Tr. 65; *see id.* ("Q. When you were speaking with agents in your apartment, you were not going through withdrawal; is that correct? A. That's correct.")).

Both Alahverdian and Marino testified that O'Brien gave no appearance of being in withdrawal--and said nothing about needing immediate medical attention--either at the Apartment or during the drive to the Suffolk County police precinct. (*See, e.g.*, Aug. 13 Tr. 19, 27-29, 31-32, 46, 61; Aug. 22 Tr. 17, 32-34.) And although at the end of the interview at the police precinct O'Brien told the agents that he felt ill, the transcript of his ensuing county court proceeding--in which O'Brien himself explained the workings and effect of GHB, telling the court that the actual name of GHB is "Gamma-Hydroxybutyrate"--counters his claim that his cognitive powers were impaired. Indeed, at the suppression hearing O'Brien admitted that in the county court proceeding he in fact "had no difficulty understanding what was going on" (Aug. 22 Tr. 82).

35

The district court discredited, as it was entitled to, O'Brien's claim that, when he arrived at the county court, he was having a seizure. That claim is belied by the undisputed facts that he and his attorney made no mention of his physical condition until late in that court proceeding; and that when his attorney introduced the fact of his addiction, there was no mention whatever of a seizure--either by the attorney or by O'Brien himself. As the district court found, the county court transcript of O'Brien's responses--some hours after his last ingestion of GHB--reveals that O'Brien acted in that proceeding as a capable and articulate advocate for himself and negates any inference that he was impaired when he agreed to speak with the agents earlier.

In sum, the circumstances as a whole, as reflected in the present record, reveal no error either in the district court's findings that O'Brien received proper *Miranda* warnings, fully understood them, and voluntarily made statements to the agents, or in the court's conclusion that he thus waived his Fifth Amendment right to remain silent.

2. *O'Brien's Consents To Search*

"It is . . . well settled that one of the specifically established exceptions"

36

to the Fourth Amendment requirements that private property not be searched without a search warrant issued upon probable cause "is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When the "'prosecut[ion] seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given.'" *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

The analysis required to determine whether consent to search was given freely and voluntarily, however, differs somewhat from the above Fifth Amendment analysis as to whether the postarrest right to remain silent was "knowingly" and voluntarily waived, for "[t]here is a vast difference between those [Fifth Amendment truth-seeking] rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." *Schneckloth*, 412 U.S. at 241. Whereas "[a] strict standard of waiver has been applied to those [Fifth Amendment] rights guaranteed to a criminal defendant to insure that" he "has not unknowingly relinquished the basic protections . . . thought indispensable to a fair trial," *id.* at 242, the Fourth Amendment's focus is not on truth-seeking at trial but rather on "protect[ing] the 'security of one's privacy against arbitrary intrusion by the police,'" *id.* (quoting *Wolf v. Colorado*, 338 U.S. 25, 27 (1949)).

Thus, focusing on what constitutes a valid consent for Fourth Amendment purposes, the *Schneckloth* Court concluded that the considerations informing the *Miranda* rule--that knowledge of a right to refuse to speak is an indispensable element of a valid waiver of the privilege against self-incrimination-- "are simply inapplicable" to requests for a relaxation of one's insistence on the right to privacy. *Id.* at 246. It ruled that the appropriate Fourth Amendment question is "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied." *Id.* at 227. Finding "no reason . . . in the area of consent searches" to deviate "from the traditional definition of 'voluntariness,'" *id.* at 229, the Court stated that voluntariness "is a question of fact to be determined from the totality of all the circumstances," *id.* at 227. And "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.*; *see also id.* at 248-49; *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) ("*Schneckloth* . . . thus emphasized that the voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries.").

*Schneckloth* announced its test in the context of the prosecution's reliance on consent given by the subject of the search who was not in custody. In *United States*

38

*v. Watson*, 423 U.S. 411 (1976), the Court held that the fact that consent was given by the subject of the search while he was in custody does not change the test; custody is a factor to be considered, but not one that is dispositive. *Id.* at 424 ("the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"; "under *Schneckloth*, the absence of proof that [the defendant] knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance").

As "[t]he touchstone of the Fourth Amendment is reasonableness," *Florida v. Jimeno*, 500 U.S. 248, 250 (1991), "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251. Thus, "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (internal quotation marks omitted).

In the present case, the district court correctly determined that O'Brien consented to the searches of his College Point and 41st Road apartments and that his

39

consents were not the product of duress or coercion, express or implied. While O'Brien insists that his consent was involuntary because he was not informed that he could refuse to give consent, that contention is legally and factually flawed. As discussed above, Fourth Amendment standards do not make it mandatory to advise a suspect of his right to refuse consent to search. And in any event, the Written Consent To Search signed by O'Brien stated that he had in fact been informed that he could refuse to consent to the search of his properties. O'Brien's testimony, varying between, *inter alia*, claiming no recollection that he received appropriate warnings and asserting categorically that he did not, provides no basis for overturning the district court's finding.

Nor does the record support O'Brien's contention that the circumstances of his arrest on October 10 were inherently "coercive" (O'Brien brief on appeal at 42). O'Brien's effort to liken his case to *Isiofia*, 370 F.3d 226, in which we affirmed the grant of a suppression motion, falls woefully short. In *Isiofia*, the district court had plausibly found that a defendant's consent to search his apartment, computer, and car was not voluntary when it was given only after, *inter alia*, (a) agents entered Isiofia's apartment unlawfully, (b) eight agents remained in the living room with him for up to an hour and a quarter without a valid reason to remain there, (c) the agents did not

40

tell him with what crime he was being charged, and (d) they gave Isiofia--who lacked fluency in English--two consent-to-search forms that did not describe the nature of the objects to be seized (one leaving that detail "blank" and the other being "helplessly vague"). *See id.* at 231 (internal quotation marks omitted); *id.* at 234.

While O'Brien claims parallel circumstances by stating that he was arrested and "surrounded" by a team of 10 or more officers from different agencies (O'Brien brief on appeal at 43), the similarity ends with the fact that a large number of officers entered O'Brien's home. Here, there was no illegal entry; the officers had a well-founded fugitive warrant for his arrest, which allowed them to enter his Apartment to execute the arrest, *see*, *e.g.*, *Steagald v. United States*, 451 U.S. 204, 221 (1981). After O'Brien was arrested and seated on a couch in his living room, he was not surrounded by officers; only Alahverdian and Marino were there with him; the other officers were conducting a security sweep elsewhere in the apartment. Similarly, at the Suffolk County police precinct, the only officers in the interview room with O'Brien were Alahverdian and Marino. Further, O'Brien's own statements and explanations in the record in this case foreclose any suggestion that O'Brien was not fluent in the English language. And not only did the agents testify that they and O'Brien had no difficulty understanding each other; O'Brien--while saying that he

41

remembered meeting Marino but not Alahverdian in the Apartment--testified that he "had no difficulty communicating with [Marino]" (Aug. 22 Tr. 65).

Nor does the record indicate that either Alahverdian or Marino engaged in any coercion or intimidation. Marino testified that they did not (*see* Aug. 22 Tr. 36); they were in the Apartment for only some 20 minutes, part of that time being needed to allow O'Brien to get dressed (*see id.* at 14). And O'Brien did not describe any threatening or coercive statements or conduct by the officers.

The record also belies any notion that O'Brien felt intimidated. For example, "throughout the course of the day" O'Brien sought to bargain with the agents by offering to provide information to assist their investigation if it might keep him out of jail (Aug. 22 Tr. 34). Marino described O'Brien as calm, lucid, and speaking freely (*see, e.g., id.* at 31-33, 34); Alahverdian described the conversation with O'Brien during the ride to the Suffolk County police precinct as "pleasant" (Aug. 13 Tr. 29). And in O'Brien's own description to his ex-fiancée on October 16, 2013, of his October 10 consent to search the Apartment, he sounded anything but intimidated. He admitted telling her that when they asked if they could search, he said "go ahead," "take a look," "feel free" (Aug. 22 Tr. 69).

Alahverdian also testified that in the Apartment, O'Brien thanked Marino for granting his plea for a Valium; when they arrived at the precinct, O'Brien thanked the agents for their considerate treatment in general. (Aug. 13 Tr. 18, 47, 21-22.) And O'Brien himself testified that the agents had proceeded expeditiously on October 10 because "they took it seriously that I needed medical attention." (Aug. 22 Tr. 57; *see also id.* at 102 (Marino testifying that when they "were concluding the interview" at the precinct, O'Brien "said he wasn't feeling well and he wanted to see a doctor. The interview stopped, I advised Suffolk County," and turned O'Brien over to the local officers.).)

O'Brien's contention that he was incapable of giving consent voluntarily because he was experiencing withdrawal from GHB is refuted by the record discussed in Part II.A.1. above, supporting the district court's permissible finding that O'Brien's cognitive and volitional functions were not impaired by his withdrawal from GHB.

Finally, we reject O'Brien's additional suggestion that his ability to refuse consent was overborne by Marino's acceding to his request to alleviate the effects of GHB withdrawal by taking a Valium (*see* O'Brien brief on appeal at 43 (being "given a Valium . . . could have only served to increase his impairment"); *see also id.* at 38)).

43

O'Brien points to no evidence to support this supposition. In contrast, the evidence includes medical records showing that when O'Brien arrived at the hospital complaining of GHB withdrawal, one of the medicines he was immediately given was Valium. (*See*, *e.g.*, Hospital Discharge Summary at 1 (when O'Brien arrived at the hospital and "stated that he was using GHB," had been "taking GHB for the last few years, every 2-3 hours[,] and presented with tachycardia, disphoresis, and tremulousness," "[h]e was given *Valium* 5 IV, Librium 50 p.o., and a bolus of normal saline, to which he responded and a decision was made not to place him in the ICU for further monitoring." (emphasis added)).

In sum, we see no error of fact or law in the district court's denial of O'Brien's motion to suppress the evidence discovered in the searches to which he consented.

B. *O'Brien's Insufficiency Argument*

The Controlled Substances Act ("CSA") provides, *inter alia*, that it is "unlawful for any person knowingly or intentionally . . . to . . . possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1). It is also unlawful for any person "knowingly or intentionally" to "import[] . . . a controlled substance" into

44

the United States. 21 U.S.C. §§ 960, 952. The indictment charged O'Brien with violating these sections by knowingly importing and possessing with intent to distribute methylone and anabolic steroids; with violating 21 U.S.C. §§ 963 and 846, respectively, by conspiring to import and to possess with intent to distribute those substances; and with violating 21 U.S.C. § 856 by knowingly and intentionally renting and maintaining premises for the purpose of distributing methylone, a controlled substance. O'Brien argues that he was entitled to acquittals on the ground that the government did not prove that he knew methylone was a controlled substance. We disagree.

Knowledge that the commodity being imported or possessed for distribution was a controlled substance is an element of each of the above offenses; and in order to convict, the government must establish that knowledge beyond a reasonable doubt. *See, e.g., United States v. Abdulle*, 564 F.3d 119, 125 (2d Cir. 2009) ("*Abdulle*") (§§ 841(a)(1) and 846); *United States v. Hassan*, 578 F.3d 108, 121 (2d Cir. 2008) (§§ 952 and 963); *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003) ("*Hamilton*") (§ 856), *cert. denied*, 540 U.S. 985 (2003). *See also McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015) (the CSA requires only that the defendant know that the substance he is dealing with is listed on the federal drug schedules, not that he know

45

precisely what the substance is); *Abdulle*, 564 F.3d at 126 ("A defendant may be convicted of a violation of 21 U.S.C. § 846 without knowing the exact type of drug involved. The government need only prove that the defendant was aware that some controlled substance was involved." (internal quotation marks omitted)).

It is seldom possible to present direct evidence of a person's state of mind. His knowledge may, however, be inferable from outward manifestations such as his statements or his conduct, or from the circumstances surrounding or attendant upon the fact he is alleged to have known. *See, e.g.*, *United States v. Nersesian*, 824 F.2d 1294, 1314 (2d Cir. 1987). Efforts a defendant has made toward concealment, for example, of either the nature of an activity or his participation in it, may support an inference that he knew the activity was unlawful. *See, e.g.*, *Abdulle*, 564 F.3d at 129 ("a rational jury could have found that [the defendant in question] possessed and intended to deal in a controlled substance by inferring that he and the others expedited [its] importation . . . and concealed its contents in order to minimize the possibility that their illicit activities would be detected").

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. *See, e.g.*, *United States v. Romano*, 794 F.3d 317, 335 (2d Cir. 2015); *United States v. Leonard*, 529 F.3d 83, 87 (2d Cir. 2008) ("*Leonard*"); *United*

*States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004); *Hamilton*, 334 F.3d at 179. In assessing such a challenge, we are required to view all of the evidence--whether direct or circumstantial--in the light most favorable to the government. *See, e.g., Glasser v. United States*, 315 U.S. 60, 80 (1942), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) ("*Eppolito*"), *cert. denied*, 555 U.S. 1148 (2009); *Leonard*, 529 F.3d at 87. We consider items of evidence not in isolation but in conjunction, *see, e.g., United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000); *United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994), *cert. denied*, 513 U.S. 1135 (1995); we defer to the jury's evident assessments of the credibility of the witnesses and its resolution of the weight of the evidence, *see, e.g., United States v. Coté*, 544 F.3d 88, 99 (2d Cir. 2008) ("giv[ing] full play to the right of the jury to determine credibility"); *United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997), *cert. denied*, 524 U.S. 905 (1998); *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998); we credit every inference that the jury could have drawn in the government's favor, *see, e.g., Eppolito*, 543 F.3d at 45; *Leonard*, 529 F.3d at 87; and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., Eppolito*, 543 F.3d at 45-46; *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003).

In sum, the conviction must be upheld if "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard, reemphasized in the Supreme Court's recent opinions, makes "clear" that "on direct appeal, 'it is the responsibility of the jury--not the court--to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)).

The jury in this case was properly instructed that in order to convict O'Brien on any of the counts against him, it was required to find that he knew the products he was importing and possessing with intent to distribute were controlled substances. There was no question that O'Brien knew that the substances he was importing were methylone and anabolic steroids. He admitted to Alahverdian and Marino that he ordered methylone and anabolic steroids online from sellers he knew were in China. And, as described in Part I.A. above, the search of O'Brien's College Point Apartment turned up dozens of airway bills for packages mailed from China. Contrary to O'Brien's repeated statement in his *pro se* opening to the jury that he had

48

"nothing to hide," the many steps he took to conceal the contents of those packages and his connection to them provided fertile ground for the inference that he knew that dealing in those substances was unlawful.

First, rather than going through traditional banking channels, O'Brien paid for his orders of these substances using bitcoins and multiple money remitter services. This enabled him to, *inter alia*, make his purchases without using his own name. (*See generally* Trial Transcript ("Trial Tr.") at 117, 280-82, 288-90.)

Second, O'Brien never had his purchases of methylone and anabolic steroids addressed to himself or sent to his apartments. He hired people to rent mail boxes in their own names--or in false names--at mailbox stores throughout Brooklyn. As described in Part I.A. above, the items found in the search of O'Brien's College Point Apartment included not only applications and receipts for mailbox rental agreements at multiple mailbox store locations (*see* Trial Tr. 214), but also a cache of false identification cards, along with blank ID cards and a printer that could create more. O'Brien had the packages of methylone and anabolic steroids he ordered from China addressed to the persons who rented the mailboxes and sent to the various mailbox store locations. When the packages arrived, O'Brien had the persons he had hired retrieve them. For example, he told the agents on October 10 that he had had

his friend Michael Wagner rent a mailbox in Wagner's name, and he paid Wagner $200 each time he picked up a box of Molly from a mailbox store and brought it to O'Brien. (*See* Trial Tr. 117.)

In addition, the packages containing O'Brien's purchases were themselves fraudulently labeled. The intercepted packages that led to O'Brien's eventual arrest on the present charges bore labels that misrepresented their contents as various uncontrolled substances, when in fact they contained methylone and anabolic steroids that O'Brien had ordered.

Lastly, after the drugs ordered from China arrived and had been picked up by O'Brien's retrievers and given to O'Brien, O'Brien stored them in Apartment 5E on 41st Road--identified in his Written Consent To Search as one of "my apartment[s]." To rent that apartment O'Brien had used the alias "George Manolas."

In the district court, O'Brien moved for acquittal under Fed. R. Crim. P. 29 on the principal ground that the government had failed to establish that he was the lessor of the 41st Road apartment in the name George Manolas. The district court denied that motion. *See United States v. O'Brien*, No. 13-CR-586 (RRM), 2017 WL 2371159 (E.D.N.Y. May 31, 2017) ("Rule 29 Decision"). O'Brien has not challenged that decision on appeal, and any further argument that "George Manolas" was not one of

O'Brien's aliases has been waived.

In any event, the government's contention that the "George Manolas" who leased the apartment at 41st Road was O'Brien was amply supported by several categories of circumstantial evidence, including (a) trial testimony of Alahverdian and/or Marino that O'Brien admitted that the 41st Road apartment was his stash house, supplied the exact number of the apartment (5-E) when Marino said the agents knew it was on the fourth or fifth floor, and reasonably accurately described what the agents would find inside that apartment, *see* Rule 29 Decision, 2017 WL 2371159, at *10 (citing Trial Tr. 119-25, 683); (b) recordings of two telephone calls by O'Brien in October 2013 from the county jail to his then-girlfriend, instructing her to open the mail at his College Point Apartment addressed to George Manolas, *see* Rule 29 Decision, 2017 WL 2371159, at *11 (citing Trial Tr. 250, 253); and (c) testimony by Schottenfeld describing the batches of false identification documents found in the search of the College Point Apartment, including birth certificates, social security cards, and police identification cards in names other than O'Brien's, including the names Jeremy Soto, Stephen Conte, and George Manolas, with some of the Conte and Soto identification documents bearing photographs of O'Brien (*see* Trial Tr. 193-99).

In sum, O'Brien contrived to order and pay for methylone and anabolic steroids without using his real name; to have the drug packages labeled as containing uncontrolled substances; to have the packages addressed to persons other than himself, sent to addresses other than his, and retrieved by other persons without mention of his name; and to have the drugs warehoused in a place he leased under an alias. Such precautions lent themselves easily to a rational inference that O'Brien was aware that the drugs in which he dealt were controlled substances.

Finally, O'Brien also explicitly evinced his wariness of the law enforcement tactic of apprehending drug traffickers by subjecting intercepted suspicious packages to controlled deliveries. In an O'Brien message that was read to the jury--apparently an email to a supplier, saying "'65k is a very appealing offer. Okay,'"--O'Brien indicated that his staff had previously been caught in such a maneuver, saying:

> "*Here is the problem with why i am so nervous about the current shipment--keep in mind i am very experienced...* [T]his tracking number . . . says they made an attempt to deliver. [T]hat is IMPOSSIBLE. [I]t is a mailbox rental store and there is ALWAYS a person there to receive parcels--it's simply what they are in business to do... [T]hey rent mailboxes. [N]ot to mention that I receive parcels there every week from China with no problems. . . . *[I]n my unfortunate experience in the past*, along with the other wholesalers I know, *this is a trap. I send my worker in to sign for the package and they arrest them on the spot*."

52

(Trial Tr. 291-92 (quoting Government Exh. 413) (emphases ours).)

We conclude that the evidence as a whole was ample for the jury to infer that O'Brien knew that the substances in which he knowingly dealt, methylone and anabolic steroids, were in fact controlled substances.

C.    *O'Brien's Challenges to the Scheduling of Methylone as a Controlled Substance*

Finally, O'Brien contends that the district court erred in denying his posttrial motion for acquittal on the ground that the indictment charging him with unlawful conduct with respect to methylone was constitutionally flawed because the scheduling of methylone as a controlled substance was accomplished through (a) an impermissible delegation of congressional power to the United States Attorney General, and (b) the Attorney General's subdelegation of that power to the DEA. He also argues that the scheduling process was insufficient to afford him the notice mandated by principles of due process. We reject these contentions because such challenges were required to be made prior to trial and because, in any event, they lack merit.

53

### 1. *Untimeliness*

The Federal Rules of Criminal Procedure provide that certain types of objections to a prosecution "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3) (2014). This requirement serves a number of purposes, including sparing the court, the witnesses, and the parties "the burden and expense of a trial," *Davis v. United States*, 411 U.S. 233, 241 (1973) (discussing 1944 version of Rule 12), and "insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn, a result that would . . . force courts frequently to confront complex Double Jeopardy questions," *United States v. Spero*, 331 F.3d 57, 62 (2d Cir. 2003) (discussing 2002 version of Rule 12) (internal quotation marks omitted).

The categories of motions that must be made before trial are those that assert "a defect in instituting the prosecution," Fed. R. Crim. P. 12(b)(3)(A) (2014), or assert "a defect in the indictment," *id.* Rule 12(b)(3)(B). As amended in 2014, Rule 12(b)(3) provides "a nonexclusive list of commonly raised claims under each category." Advisory Committee Note (2014) ("2014 Advisory Note"). The examples include "an error in the grand-jury proceeding," Rule 12(b)(3)(A)(v), and the

indictment's "failure to state an offense," *id.* Rule 12(b)(3)(B)(v). *See also* 2014 Advisory Note (noting that prior language allowing a motion to dismiss for failure to state an offense to be made at any time, on the theory that that failure was "jurisdictional," was removed in light of the Supreme Court's decision in *United States v. Cotton*, 535 U.S. 625, 629-31 (2002), that such a flaw does not implicate the court's jurisdiction).

If a motion falling within Rule 12(b)(3) is not made before trial (or before such pretrial deadline as may be set by the court for such motions), it is "untimely." Fed. R. Crim. P. 12(c)(3) (2014). If the motion is untimely, the court may nonetheless entertain it if the movant shows "good cause" for his failure to make it prior to the deadline. *Id.* Such provisions, albeit with slight variations in wording and numbering, have been included in Rule 12 since its inception in 1944. *See, e.g.*, *Davis*, 411 U.S. at 236 (discussing the original version of Rule 12, which stated in pertinent part, that "'[d]efenses and objections based on defects in the institution of the prosecution or in the indictment . . . may be raised only by motion before trial,' and that failure to present such defenses or objections 'constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver'" (quoting Fed. R. Crim. P. 12(b)(2) (1944)); *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 362 (1963) ("*Shotwell*") (same).

55

Both *Davis* and *Shotwell* dealt with posttrial claims that the prosecutions had been defectively instituted because their respective grand juries had been convened pursuant to selection methods not designed to draw from a cross-section of the community. *See*, *e.g.*, *Davis*, 411 U.S. at 235; *Shotwell*, 371 U.S. at 460-61. In both cases, the Supreme Court concluded that the Rule 12 waiver provision "precludes untimely challenges to grand jury arrays, even when such challenges are on constitutional grounds." *Davis*, 411 U.S. at 238 (citing *Shotwell*, 371 U.S. at 363).

In *Shotwell*, the Court upheld findings that no "cause" sufficient to "warrant relief from" Rule 12's waiver provision was shown where "the facts [underlying the challenge] were notorious and available to petitioners in the exercise of due diligence before the trial." 371 U.S. at 363. In *Davis*, the Court similarly upheld the finding of no "cause" where the belatedly challenged system had been in use "for years," and "[n]o reason ha[d] been suggested why petitioner or his attorney could not have ascertained all of the facts necessary to present objection to the court prior to trial." 411 U.S. at 243.

We reach the same conclusions with respect to O'Brien's impermissible-delegation challenge, given the fundamental nature of the asserted defects. The contention that a federal grand jury was chosen through a process that was not

56

designed to draw from a cross-section of the community is a contention that the ensuing indictments were issued by an entity that was not constitutionally authorized to accuse any person of any crime; such a contention posits a defect in the institution of the prosecution. Likewise, a challenge to Congress's delegation to members of the Executive Branch of authorization to designate substances as controlled substances posits that the targeted conduct has been designated a crime by an entity not constitutionally authorized to say that any person may be prosecuted for that conduct. A prosecution for conduct that has been defined as criminal only by an entity without legitimate authorization to do so would be defective either in its institution or in its failure to charge a cognizable offense. If a defendant wishes to assert such a flaw, he must make his motion prior to trial if the basis for his assertion is then reasonably available.

In the present case, O'Brien's trial began on July 20, 2015. His claim that methylone had been unconstitutionally designated a controlled substance was not asserted prior to trial; it was not raised until November 2016, more than a year after he had been tried and found guilty of the charges against him. It is clear that the facts on which his motion was premised had been available to him throughout his pretrial period. As to the delegation process itself, the CSA, in which Congress authorized

57

the Attorney General to, *inter alia*, add substances to controlled substance schedules under 21 U.S.C. § 811(a), was enacted in 1970, *see* Pub. L. 91-513, 84 Stat. 1242 (codified at 21 U.S.C. § 801 et seq.). The Attorney General's regulations delegating authority to the DEA to schedule controlled substances on a temporary basis were promulgated in 1990. *See* 28 C.F.R. § 0.100(b) (1990). And the particulars of the delegation process were described in detail by the Supreme Court in 1991 in *Touby v. United States*, 500 U.S. 160, 162 (1991), which rejected an impermissible-delegation challenge to convictions for manufacture and conspiracy to manufacture 4-methylaminorex, more commonly known as "Euphoria."

The designation of methylone as a controlled substance occurred well before O'Brien's October 29, 2013 arrest in this case. Notice of Intent to designate methylone as such a substance temporarily was published in the Federal Register on September 8, 2011, *see* 76 Fed. Reg. 55616; Notice of Proposed Rulemaking to make its placement in Schedule I permanent was published in the Federal Register on October 17, 2012, *see* 77 Fed. Reg. 63766; and the permanent scheduling of methylone was published in the Federal Register on April 12, 2013, *see* 78 Fed. Reg. 21818.

O'Brien was thus arrested on the present charges of unlawfully dealing in methylone more than six months after the publication of notice that methylone was

permanently scheduled as a controlled substance, and more than two years after publication of its temporary designation as a controlled substance. Thus, the components of O'Brien's impermissible-delegation challenge were available to O'Brien prior to his July 2015 trial. They were matters of public record.

The only excuse offered by O'Brien for the failure to make his delegation challenge prior to trial was that he was proceeding *pro se*, stating that "it's a lot for a regular defendant to know and to learn" (Sentencing Transcript January 20, 2017, at 17). This explanation was specious at best. Even assuming that a defendant's *pro se* status could be accepted as "good cause" for his failure to make a timely challenge to long-established procedures, that excuse would have no validity in this case. O'Brien's citation of his *pro se* status ignored the fact that he did not become *pro se* until about two months before his trial; for the preceding 19 months of the prosecution, O'Brien had been represented by counsel. There had been ample opportunity and expertise to allow for the making of an impermissible-delegation challenge prior to trial, if one had been warranted.

2. *Lack of Merit*

In *Touby*, the Supreme Court considered contentions that Congress, in

59

authorizing the Attorney General to add, remove, and transfer substances across the controlled substance schedules under 21 U.S.C. § 811(a), "unconstitutionally delegate[d] legislative power to the Attorney General," 500 U.S. at 162, as well as contentions that the Attorney General could not permissibly subdelegate that authority to the DEA, *see id.* at 169. The Court rejected those contentions in the context of the scheduling of 4-methylaminorex. *See id.* at 165-69. We see no principled basis on which to reach a different conclusion with respect to O'Brien's parallel challenges to the scheduling of methylone. Whether timely or not, those challenges lacked merit.

O'Brien also contends that publication of the intended and actual scheduling of methylone as a controlled substance in the Federal Register was insufficient to provide notice that dealing in methylone was unlawful. However, Congress requires that "documents having general applicability and legal effect"-- which includes "every document or order which prescribes a penalty"--"shall be published in the Federal Register," 44 U.S.C. § 1505(a); and it has provided that proper publication of a document in the Federal Register "is sufficient to give notice of the contents of the document to a person subject to or affected by it," *id. § 1507.* Accordingly, when "regulations, which are given the force of law, are published in

60

the Federal Register, . . . constructive notice of their contents is thus given all persons affected by them." *Yakus v. United States*, 321 U.S. 414, 435 (1944); *see, e.g., United States v. Kelly*, 874 F.3d 1037, 1048 (9th Cir. 2017) (after making the requisite findings, the DEA temporarily scheduled ethylone, and "[w]hen the DEA filed the Notice and Order in the Federal Register, Kelly received fair notice that ethylone was a controlled substance" (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 2038 (2018)).

As set out above, the intended and actual scheduling of methylone as a controlled substance were published in the Federal Register. We thus reject O'Brien's lack-of-notice argument.

We note also that, as discussed in Part II.B. above, the statutory provisions under which O'Brien was prosecuted made his conduct unlawful only if he "knew" he was dealing with a controlled substance. There is no dispute that O'Brien knew that he was dealing in methylone; and, as discussed, the properly instructed jury found beyond a reasonable doubt, based on ample evidence, that O'Brien knew methylone was a controlled substance.

## CONCLUSION

We have considered all of O'Brien's contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.